PEOPLE v ROPER

Docket No. 285137. Submitted October 6, 2009, at Lansing. Decided
October 22, 2009, at 9:10 a.m.

Andre A. Roper was convicted by a jury in the Washtenaw Circuit
Court, Archie C. Brown, J., of second-degree murder. Defendant
appealed, challenging both the weight and the sufficiency of the
evidence and the court's decision to permit the prosecution to
introduce evidence of specific acts of prior conduct by defendant
for the purpose of showing defendant's aggressive character.

The Court of Appeals *held*:

1. There was sufficient evidence to establish that defendant
had the requisite malice to convict him of second-degree murder.
Malice may be inferred from defendant's use of a knife to stab the
victim. Defendant's act of grabbing a knife, brandishing it, and
then stepping up and swinging it at the victim at close range
establishes that defendant intentionally set in motion a force likely
to cause death or great bodily harm that was in obvious disregard
of the life-endangering consequences. Defendant's intent may be
inferred from the fact that, after he stabbed the victim, he followed
the victim out of the trailer and began to kick and stomp on him
while taunting him.

2. There was sufficient evidence from which the jury could
conclude beyond a reasonable doubt that defendant did not in fact
fear for his life or fear great bodily injury from the victim and
therefore was not justified in using deadly force against the victim.
The evidence was sufficient to rebut defendant's claim of self-
defense.

3. Sufficient evidence was presented from which the jury could
conclude that defendant was not provoked to the extent necessary
to mitigate the homicide from murder to manslaughter.

4. The trial court did not abuse its discretion in determining
that defendant's conviction was not against the great weight of the
evidence. The trial court properly denied defendant's motion for a
new trial.

5. A prosecutor may present rebuttal evidence concerning
specific instances of conduct to prove a defendant's character,

notwithstanding the limitations imposed under MRE 405, when all the following are true: the defendant places his or her character at issue through testimony on direct examination; the prosecution cross-examines the defendant about specific instances of conduct tending to show that the defendant did not have the character trait he or she asserted on direct examination; the defendant denies the specific instances raised by the prosecution in whole or in part during the cross-examination; and the prosecution's rebuttal testimony is limited to contradicting the defendant's testimony on cross-examination.

6. Defendant clearly put his character for aggression at issue on direct examination. Defendant repeatedly denied the relevant conduct when the prosecution cross-examined defendant about specific instances of conduct that tended to show that he had an aggressive character. The prosecution therefore was properly allowed to call a rebuttal witness to testify about the specific instances denied by defendant on cross-examination.

7. The probative value of the rebuttal evidence was not substantially outweighed by the danger of unfair prejudice. The trial court's instruction to the jury that it should use the rebuttal evidence only when considering defendant's character for aggression or peacefulness adequately safeguarded defendant's rights.

Affirmed.

CRIMINAL LAW — EVIDENCE — CHARACTER EVIDENCE — REBUTTAL EVIDENCE — SPECIFIC INSTANCES OF CONDUCT.

A prosecutor may present rebuttal evidence concerning specific instances of conduct to prove a defendant's character, notwithstanding the limitations imposed under MRE 405, when all the following are true: the defendant places his or her character at issue through testimony on direct examination; the prosecution cross-examines the defendant about specific instances of conduct tending to show that the defendant did not have the character trait he or she asserted on direct examination; the defendant denies the specific instances raised by the prosecution in whole or in part during the cross-examination; and the prosecution's rebuttal evidence is limited to contradicting the defendant's testimony on cross-examination.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, *Brian L. Mackie*, Prosecuting Attorney, and *David A. King*, Assistant Prosecuting Attorney, for the people.

*Peter Ellenson* for defendant.

Before: TALBOT, P.J., and WILDER and M. J. KELLY, JJ.

PER CURIAM. Defendant appeals as of right his conviction by a jury of second-degree murder. MCL 750.317. The trial court sentenced defendant to serve 250 months to 720 months in prison for the conviction. On appeal, defendant challenges the sufficiency and the weight of the prosecutor's evidence and challenges the trial court's decision to permit the prosecutor to introduce evidence of specific acts of prior conduct by defendant for the purpose of showing defendant's aggressive character. We conclude that the jury's verdict was fully supported by the evidence. We also conclude that the prosecutor could properly cross-examine defendant about specific instances of conduct tending to show his aggressive character after defendant presented testimony tending to permit an inference that he could not have committed the charged crime because he had a character for peacefulness. Furthermore, once defendant unequivocally denied on cross-examination that he had committed the acts giving rise to an inference of aggressiveness, we conclude that the prosecutor could properly call rebuttal witnesses to testify about the specific instances that defendant denied. Because there were no errors warranting relief, we affirm.

### I. BASIC FACTS

Defendant's conviction arises from the stabbing death of his roommate, Anthony Jones, in August 2007. At that time, defendant lived in a trailer with three other young men: Larry Farmer, Theodore Morrow, and Jones. The roommates were all friends and socialized together.

On the night at issue, Jones, Morrow, and defendant went to a nightclub that they often went to on Thursday nights. Farmer did not attend because he was in California. Morrow testified that when they arrived, they ordered drinks. However, when the bartender returned, defendant was gone. Morrow said that he and Jones ended up paying for defendant's drink. When defendant returned, Morrow said that he and Jones confronted defendant by telling him that they did not "appreciate him . . . not footing his part of the bill." Morrow said that defendant agreed to pay for the next round and then had his girlfriend, Chelsea Morris, actually pay for the next round.

Morrow stated that everything seemed normal on the drive home from the bar. When they got back to the trailer, Morrow took a beer from the refrigerator and sat down at the computer table in the living room area to play video games. Morrow testified that he called his girlfriend and asked her to come over. At some point after they got back, Jones again confronted defendant about the "situation" with the drinks. Morrow said that Jones also began to bring up other roommate issues such as food and drinks missing from the refrigerator. During the argument, Morrow said that he would state his agreement with Jones, but otherwise continued to play the video game.

Defendant testified that, when they got back to the trailer, Jones began to yell at him about the round of drinks back at the bar: " 'It wasn't cool you know. You know we don't have really money for that blah, blah, blah, you know.' " Defendant said that Morrow chimed in as well and would every so often agree and say " 'dude that wasn't cool.' " Defendant stated that Jones eventually got in his face and Morrow told him to " 'chill.' "

Morrow agreed that Jones got into defendant's face and at one point pushed defendant, who stumbled back into the computer table and spilled Morrow's beer. Morrow said he got some tissue, cleaned up the spill, and then returned to his video game. Morrow stated that defendant seemed surprised by the shove, but the argument continued with just words. Morrow testified that he did not take the argument too seriously. At some point, defendant and Jones moved into the adjacent kitchen area.

Defendant testified that Jones chest-bumped him and then pushed him into the computer table. At this point, defendant said he began to back into the kitchen and Jones approached him and punched him. Defendant said that he saw Jones with his shirt off and approaching again when defendant grabbed a knife from the kitchen counter. Defendant testified that Jones stopped at this point and said, " 'you going to grab a knife mother fucker, you pussy' or some shit like that." Defendant said that Jones then lunged his shoulders forward. Defendant testified that, at that point, he stepped up and swung the knife at Jones.

Morrow testified that he was playing his video game as defendant and Jones moved into the kitchen. He then heard what sounded like a noise from body-on-body contact or body-on-inanimate-object contact and heard Jones say, " 'what the fuck you're going to grab a knife.' " At that, Morrow turned toward the kitchen and saw Jones run toward the back of the trailer. Morrow said that there was blood everywhere and defendant was holding a knife.

Morrow immediately got up, pulled defendant's arms behind his back, and told him to drop the knife. Morrow said that defendant was very angry, but only lightly resisted his efforts. Morrow testified that, while he was

telling defendant to drop the knife, defendant was saying, "fuck that, fuck him." Morrow said defendant eventually dropped the knife, but not before Jones ran outside. Morrow stated that he let defendant go and then proceeded to call 911.

A 911 tape revealed that Jones also called 911 and told the operator that his roommate had stabbed him and that he was bleeding to death. At some point Jones fell to the ground and stopped speaking with the 911 operator.

Defendant testified that he was concerned about the severity of Jones's injury and went outside to see what he was doing. When defendant got outside he went up to Jones and began to kick him in the ribs. Defendant said he kicked him because he was still angry and told Jones "you shouldn't have fucked with me." Morrow testified that when he came out of the trailer he saw defendant kicking Jones and stating: " '[W]ho's tough now, you're not such a tough guy now are you.' " Morrow stated that he yelled at defendant to stop and that defendant eventually went to his car and drove quickly from the area. Defendant's angry tones were apparently audible on the recording of Jones's phone call to 911, which was still being recorded even after Jones stopped speaking.

Defendant's ex-girlfriend, Sarah Makela, testified that defendant called her about that time. She said that defendant was hysterical and asked for the phone number of her lawyer. She said that he told her that he "snapped," stabbed Jones, kicked him, stomped on his head, and left him on the ground "gurgling." She said that defendant explained that Jones kept pushing him, which she took to mean that Jones was in defendant's face about something.

Morrow and his girlfriend, who had just arrived, tried to assist Jones. Morrow's girlfriend testified that every time Morrow tried to perform CPR, Jones would cough up blood.

A medical examiner testified that Jones had suffered a single knife wound to his neck. The wound was on Jones's left side and proceeded downward more than three inches into Jones's neck. The knife severed Jones's external carotid artery and his throat. Jones bled extensively into his stomach, aspirated some blood, and died from acute loss of blood.

Defendant was arrested and eventually tried on a single charge of open murder. Defendant did not contest that he caused Jones's death by stabbing him. However, he asserted that it was justifiable as self-defense or, in the alternative, that he did so under circumstances that amounted to manslaughter rather than first- or second-degree murder. The jury rejected these defenses and returned a verdict of guilty on the charge of second-degree murder.

## II. SUFFICIENCY AND WEIGHT OF THE EVIDENCE

### A. STANDARD OF REVIEW

We shall first address defendant's challenges to the sufficiency and the weight of the evidence against him. In challenges to the sufficiency of the evidence, this Court reviews the record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. *People v Martin*, 271 Mich App 280, 340; 721 NW2d 815 (2006).

In contrast to a challenge to the sufficiency of the evidence, a motion for a new trial based on a belief that

the verdict was against the great weight of the evidence does not implicate issues of constitutional magnitude and, for that reason, the decision to grant a new trial is committed to the discretion of the trial court. *People v Lemmon*, 456 Mich 625, 634 n 8; 576 NW2d 129 (1998). Accordingly, this Court reviews a trial court's decision on a motion regarding the great weight of the evidence for an abuse of discretion. *People v Lueth*, 253 Mich App 670, 680; 660 NW2d 322 (2002). A trial court abuses its discretion when it selects an outcome that is not within the range of reasonable and principled outcomes. *People v Young*, 276 Mich App 446, 448; 740 NW2d 347 (2007).

### B. MALICE

Defendant first contends that there was insufficient proof that he had the requisite malice to convict him of second-degree murder. In order to convict a defendant of second-degree murder, the prosecution must prove: "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Mayhew*, 236 Mich App 112, 125; 600 NW2d 370 (1999). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998). Malice may be "inferred from evidence that the defendant 'intentionally set in motion a force likely to cause death or great bodily harm.'" *Mayhew*, 236 Mich App at 125, quoting *People v Djordjevic*, 230 Mich App 459, 462; 584 NW2d 610 (1998). "The offense of second-degree murder does not require an actual intent to harm or kill, but only the intent to do an act that is in obvious disregard of life-endangering consequences." *Mayhew*, 236 Mich App at 125, citing *Goecke*, 457 Mich at 466.

At trial, Morrow testified that, after he heard some sound in the kitchen, he heard Jones exclaim, " 'what the fuck, you're going to grab a knife.' " Morrow turned to see Jones running away, holding his head and bleeding, while defendant stood holding a knife. Morrow restrained defendant because defendant was walking after Jones while still clutching the knife. Defendant stated, "fuck him you know I don't give a fuck." Morrow felt defendant resist him when Jones ran out the front door. Defendant only released the knife after Morrow demanded that he do so several times.

As Morrow called 911, defendant followed Jones outside and then proceeded to kick Jones while taunting him: "[W]ho's tough now, you're not such a tough guy now are you" and "mother fucker you think you can fuck with me[.]" Morrow stated that defendant appeared very angry. When Morrow told defendant to stop kicking Jones, defendant got in his car and drove away. Defendant then called his current girlfriend, Morris, and a former girlfriend, Makela, crying and hysterical, and told them that he "snapped" because Jones kept "pushing me and pushing and pushing." Despite his agitated state, however, defendant had the presence of mind to request the number of a lawyer, and he fell asleep soon after he killed Jones. The police located defendant during the following day leaving his counsel's office. Defendant informed the booking agent in the jail in an "everyday normal" manner that he had "just killed [his] best friend yesterday."

This evidence was sufficient to establish the requisite malice. Defendant admitted he had grabbed a knife and stabbed Jones. Malice may be inferred from defendant's use of a knife. *People v Carines*, 460 Mich 750, 760; 597 NW2d 130 (1999). Further, defendant's act of grabbing a knife, brandishing it, and then stepping up and

swinging it at Jones at close range establishes that defendant intentionally set in motion a force likely to cause death or great bodily harm that was in obvious disregard of the life-endangering consequences. *Mayhew*, 236 Mich App at 125. Moreover, defendant's intent may be inferred from the fact that, after he stabbed Jones, he followed Jones out of the trailer and began to kick and stomp on him while taunting him. See *People v McGhee*, 268 Mich App 600, 623; 709 NW2d 595 (2005) (noting that intent may be inferred from circumstantial evidence). Accordingly, there was sufficient evidence from which a jury could conclude that defendant had the requisite malice for second-degree murder.

### C. SELF-DEFENSE AND MANSLAUGHTER

Defendant also argues that there was insufficient evidence to rebut his claim of self-defense or his mitigating circumstances defense.

At trial, defendant presented the defense of self-defense. "In Michigan, the killing of another person in self-defense is justifiable homicide if the defendant honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm." *People v Heflin*, 434 Mich 482, 502; 456 NW2d 10 (1990); see also MCL 780.972(1)(a) (providing that a person may use deadly force against another if the person "honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual"). "Once evidence of self-defense is introduced, the prosecutor bears the burden of disproving it beyond a reasonable doubt." *People v Fortson*, 202 Mich App 13, 20; 507 NW2d 763 (1993).

Defendant also presented a mitigation defense: he argued that his conduct only amounted to voluntary manslaughter. Voluntary manslaughter requires a showing that (1) defendant killed in the heat of passion, (2) this passion was caused by an adequate provocation, and (3) there was no lapse of time during which a reasonable person could have controlled his passions. *People v Pouncey*, 437 Mich 382, 388; 471 NW2d 346 (1991). "The provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason"; that is, adequate provocation is "that which would cause the reasonable person to lose control." *Id.* at 389 (citations omitted).

There was sufficient evidence from which a jury could conclude beyond a reasonable doubt that defendant did not in fact fear for his life or fear great bodily injury at Jones's hands. There was evidence that Jones was not armed and that Jones's actions, although confrontational and physical, were not particularly violent. According to Morrow, the dispute did not appear to be so serious that he thought it would become a physical fight; indeed, he continued to play his computer game throughout the argument. Likewise, there was no evidence that defendant suffered a physical injury during the altercation with Jones; and, although he testified at trial that Jones had punched him, he did not tell either Makela or Morris that Jones punched him. At best, the evidence adduced at trial suggested that defendant believed Jones might continue to hit him. Furthermore, defendant did not indicate that he feared death or serious bodily injury during the fight or say to anyone he contacted immediately after the fight that he had such fear. Rather, he merely stated that Jones kept pushing him and pushing him and that he eventually "snapped."

Defendant points to the size differences between him and Jones in support of his self-defense claim. However, the jury was free to draw its own conclusions about this evidence or reject it outright. *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992). Even if, as defendant contends, Jones punched defendant while they were in the kitchen, defendant was not permitted to immediately resort to the use of deadly force to defend himself. See *People v Kemp*, 202 Mich App 318, 322; 508 NW2d 184 (1993) (noting that, generally, a defendant is not entitled to use any more force than is necessary to defend himself or herself); MCL 780.972(1) and (2) (stating the conditions under which an individual is privileged to use deadly force or force other than deadly force). Instead of leaving the kitchen, punching Jones back, or requesting help from Morrow, defendant grabbed a knife and stabbed Jones with sufficient force to penetrate his neck by more than three inches. Moreover, the fact that defendant pursued Jones outside belies his claim that he feared for his life. On the basis of the evidence, a rational jury could conclude that defendant did not fear death or great bodily harm at Jones's hands and, therefore, was not justified in using deadly force against him.

Similarly, the prosecution presented sufficient evidence to establish that defendant's actions were not provoked to the extent necessary to mitigate the homicide from murder to manslaughter. What constitutes adequate provocation is usually a question of fact for the jury. *Pouncey*, 437 Mich at 391. The argument in this case was about minor issues occurring between roommates. Although there were some verbal exchanges, such exchanges are not usually sufficient to constitute adequate provocation. *Id*. Further, the physical dispute was apparently not significant enough to cause Morrow to be concerned and attempt to inter-

vene. On the basis of this evidence, a reasonable jury could conclude that defendant's alleged passion was not caused by provocation that would cause a reasonable person to lose control. *Id.* at 388. As our Supreme Court has explained, "[n]ot every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter." *Id.* at 389. On the basis of the evidence, the jury was free to reject defendant's claim that he acted in the heat of passion, and we will not second-guess that determination. *Wolfe*, 440 Mich at 514-515.

### D. GREAT WEIGHT OF THE EVIDENCE

Defendant also argues that his conviction was against the great weight of the evidence. Specifically, defendant contends that the evidence clearly demonstrated that he either acted in self-defense or out of passion sufficient to mitigate his actions from murder to manslaughter. In order to warrant a new trial on the ground that a verdict is against the great weight of the evidence, the evidence presented at trial must preponderate so heavily against the verdict that "it would be a miscarriage of justice to allow the verdict to stand." *People v Musser*, 259 Mich App 215, 219; 673 NW2d 800 (2003). Conflicting testimony alone will not typically warrant reversal. Rather, where there is conflicting testimony, unless "it can be said that directly contradictory testimony was so far impeached that it 'was deprived of all probative value or that the jury could not believe it,' or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination." *Id.* (citations omitted).

Defendant's arguments concerning the weight of the evidence largely mirror his claims about the sufficiency of the evidence. Defendant highlights the fact that Jones initiated the argument and pushed and hit him.

He also places emphasis on the evidence concerning the size difference between Jones and him, the evidence that he only stabbed Jones once, that he "snapped" and was crying hysterically after the stabbing, and that he had knowledge that Jones could be violent when drunk. However, none of this evidence impeached the evidence supporting the verdict to the extent that it was robbed of any probative value or contradicted the physical facts. *Id.* The size difference between them was not so significant that one had to conclude that defendant feared for his life or feared great bodily harm, and there was also evidence that defendant himself had an aggressive and violent character. Moreover, even though defendant argues that he was faced with a known raging, violent drunk, Morrow testified that no one was actually drunk, and Morrow's testimony was supported by the medical examiner's testimony. Conflicting testimony regarding Jones's level of intoxication does not create sufficient grounds for a new trial. *Lemmon*, 456 Mich at 642-643. Defendant's hysterical state was also not so extreme that he was prevented from obtaining the number for a lawyer and falling asleep soon after he killed Jones. Given these facts, we cannot conclude that the trial court abused its discretion when it determined that the jury's verdict must be left undisturbed. *Lueth*, 253 Mich App at 680.

### III. CHARACTER EVIDENCE

#### A. STANDARD OF REVIEW

Defendant finally argues that the trial court erred when it permitted the prosecution to present evidence of specific acts by defendant for the purpose of showing that defendant had a violent and aggressive character. This Court reviews a trial court's evidentiary decisions for an abuse of discretion. *Martin*, 271 Mich App at 315.

However, this Court reviews de novo whether a rule or statute precludes admission of evidence as a matter of law. *Id.* A trial court necessarily abuses its discretion when it admits evidence that is inadmissible as a matter of law. *People v Yost,* 278 Mich App 341, 353; 749 NW2d 753 (2008).

### B. THE ADMISSION OF CHARACTER EVIDENCE

Relevant evidence is generally admissible. *Id.* at 355; MRE 402. However, although evidence of character might very well be relevant to a fact at issue, the rules of evidence strictly limit both the circumstances under which character evidence may be admitted and the types of character evidence that may be admitted. See *People v VanderVliet,* 444 Mich 52, 62; 508 NW2d 114 (1993) (noting that MRE 404 limits the admission of otherwise logically relevant evidence concerning character); MRE 405 (establishing the methods by which character may be proved). Such evidence is strictly limited because of its highly prejudicial nature; there is a significant danger that the jury will overestimate the probative value of the character evidence. *VanderVliet,* 444 Mich at 62 n 11, 63-64. Accordingly, MRE 404(a) prohibits the introduction of evidence concerning a person's character "for the purpose of proving action in conformity" with that character. Similarly, MRE 404(b)(1) prohibits the introduction of evidence concerning "other crimes, wrongs, or acts" in order to "prove the character of a person in order to show action in conformity therewith." Thus, a prosecutor may not normally call witnesses to testify about a defendant's character or present evidence of other acts performed by the defendant in order to show that the defendant has a particular character and that the defendant acted in conformity with his or her character with regard to the events at issue. MRE 404(a); MRE 404(b)(1).

Notwithstanding the general prohibition against the use of character evidence and other-acts evidence that may implicate character, there are circumstances under which it is proper to admit either direct character evidence or other-acts evidence that implicates character. Notably, MRE 404(b)(1) specifically recognizes that other-acts evidence may be admissible for a non-character purpose, such as to prove motive, intent, or identity, even though the same evidence might permit an inference about character. See *Yost*, 278 Mich App at 355 (stating that evidence that is inadmissible under one rule may nevertheless be admissible under another rule, but with a limiting instruction under MRE 105); *VanderVliet*, 444 Mich at 64-65 (noting that MRE 404 is not implicated by the admission of evidence for a purpose other than to establish action in conformity with character).

In addition to the admission of other-acts evidence for a purpose other than to prove character, the rules of evidence permit the admission of evidence to prove character under specific limited circumstances. See, e.g., MRE 404(a)(2) (permitting the introduction of evidence concerning an alleged homicide victim's character for aggression under limited circumstances); MRE 608(a) (permitting a party to demonstrate a witness's character for truthfulness or untruthfulness in the form of opinion or reputation testimony); MRE 609 (permitting a party to impeach the credibility of a witness through evidence that the witness has been convicted of a crime containing an element of dishonesty or false statement, or involving a certain type of theft). One important exception to the rule that character evidence is generally inadmissible to prove action in conformity with character is found under MRE 404(a)(1).

Under MRE 404(a)(1) a defendant may offer evidence that he or she has a character trait that makes it less likely that he or she committed the charged offense. But once a defendant chooses to present evidence of his or her character, the prosecutor may also present evidence concerning that same character trait to rebut the defendant's evidence. See MRE 404(a)(1) (stating that evidence of a pertinent character trait may be offered "by an accused, or by the prosecution to rebut the same"). With this background in mind, we now turn to the character evidence presented in this case.

### C. DEFENDANT'S CHARACTER FOR PEACEFULNESS

In the present case, the prosecutor unsuccessfully moved for permission to call witnesses who would testify about specific instances where defendant engaged in violent conduct. The prosecution wanted to call defendant's ex-girlfriend, Makela, to testify about several instances where defendant drank and then attacked her under circumstances that suggested that defendant could be easily provoked to violence. Similarly, the prosecutor wanted to call witnesses to testify about an incident that took place in the bathroom of the trailer where defendant threatened them with a knife after drinking and engaging in horseplay. The prosecution argued that the evidence would be offered for a purpose other than to prove defendant's character consistent with MRE 404(b)(1). The trial court ultimately denied the motion and ordered the prosecutor to refrain from eliciting any testimony concerning these matters at trial. For that reason, the prosecutor did not present any other acts evidence during her case-in-chief.

At trial, defendant chose to testify on his own behalf. During his testimony, defendant described the events

leading up to the stabbing and suggested that he feared Jones. Toward the end of his direct examination, defendant's trial counsel inquired into defendant's state of mind when he stabbed Jones:

> *Q.* Okay. Two people have described—I'm sorry strike that. Two people have testified that in describing what happened that night to them you used the phrase quote I snapped, close quote. Do you agree with that?
>
> *A.* Yes, sir.
>
> *Q.* Tell us about it.
>
> *A.* To the point that where I was pushed so far that I, I did, I just snapped and you know I'm not the person that you know would want to do anything like that, especially to a friend. But he was continually verbally and physically pushing me, pushing me and pushing me and pushing me I just snapped.
>
> *Q.* Did you make a conscious decision to, to hurt Mr. Jones?
>
> *A.* Absolutely not.

After defendant's trial counsel finished his direct examination, the prosecutor got up and immediately began to question defendant about his character for aggression:

> *Q.* And so Anthony [Jones] was pushing you. He was asking you why didn't you pay for your bar tab. Why do you drink all of our stuff out of the refrigerator. Why don't you pay your way, wasn't he?
>
> *A.* Yes, ma'am.
>
> *Q.* And so you didn't like that, did he—did you?
>
> *A.* No, ma'am.
>
> *Q.* And he was doing that in front of Teddy [Morrow]?
>
> *A.* Yes, ma'am.
>
> *Q.* And Teddy was agreeing with him?

*A.* Yes, ma'am.

*Q.* And so he was verbally pushing you and you can only be pushed so far that's what you told Chelsea [Morris] and that's what you told Sarah Makela?

*A.* Yes, ma'am.

*Q.* And that's kind of what you do, right, when you're confronted with a situation that you don't like or where someone's, someone's verbally talking to you and saying things to you that you don't like that's how you react with violence, isn't it?

*A.* No, ma'am.

*Q.* No?

*A.* No, ma'am.

*Q.* Isn't that how you reacted against L.J., Larry Farmer?

When the prosecutor asked about the specific instance involving Farmer, defendant's trial counsel objected and noted that the trial court had prohibited this evidence from admission under MRE 404(b). The prosecutor responded that defendant had opened the door by introducing evidence of his peaceful character during his testimony on direct examination. For this reason, the prosecutor argued that she could now cross-examine defendant about specific instances of conduct tending to rebut defendant's character for peacefulness. The trial court agreed and permitted the prosecution to cross-examine defendant regarding the incident in the bathroom where defendant threatened others with a knife and regarding incidents of abuse involving his ex-girlfriend, Makela.

On appeal, defendant first argues that the trial court erred when it concluded that defendant put his own character at issue on direct examination. Defendant contends that his statement about what he "would 'not want to do' " did not place his character at issue. For

that reason, he further argues, the prosecutor could not present any character evidence.

When read in context, it is clear that defendant's testimony was not merely an expression of remorse about the stabbing. Defendant was specifically responding to a request by his attorney to describe how he "snapped." After this question, defendant stated that Jones kept pushing him and that this led to the stabbing. He explained: "[Y]ou know I'm not the person that you know would want to do anything like that, especially to a friend. But he was continually verbally and physically pushing me, pushing me and pushing me and pushing me [and] I just snapped." Thus, defendant very clearly stated that he was not the sort of person who would do "anything like that"—that is, who would resort to violence without provocation. Further, he stated that this was especially true with regard to friends. These statements are not equivocal. Defendant explicitly asserted that his actions during the fight were atypical of his character and invited the jury to conclude that he must have been severely provoked given that he did not have an aggressive or violent character. Because defendant placed his character for aggression or violence at issue on direct examination, the trial court did not err when it permitted the prosecutor to take steps to rebut defendant's assertion. MRE 404(a).

Defendant next argues that, even if he did "open the door" to the prosecutor's use of character evidence, the trial court nevertheless erred when it permitted the prosecutor to call a witness to testify about specific instances of conduct that reflected on defendant's character. Defendant argues that the prosecutor could properly cross-examine the character witness—in this case defendant himself—about specific instances, but could not call a rebuttal witness to testify about those specific

instances. Defendant contends that the prosecutor could only call a rebuttal witness to offer an opinion about defendant's character or to testify about his reputation.

MRE 405(a) governs the permissible methods for proving character in most cases: "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into reports of relevant specific instances of conduct." Accordingly, a party's ability to present evidence of a person's character is quite limited; the party may only call witnesses to offer testimony concerning their personal opinion of that person's character or to testify about that person's reputation. Moreover, although MRE 405(a) permits "inquiry" into specific instances of conduct, it limits such inquiries to cross-examination. The limitation regarding specific instances of conduct stated in MRE 405(a) is in stark contrast to the permissive rule stated in MRE 405(b): "In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct." Given the differences between MRE 405(a) and MRE 405(b), the limitation in MRE 405(a) must be understood to prohibit the presentation of evidence regarding specific instances of conduct to prove character in any case except those covered under MRE 405(b). See, e.g., *People v Champion*, 411 Mich 468, 471; 307 NW2d 681 (1981).

After the trial court determined that defendant had put his character at issue, the prosecutor continued her cross-examination of defendant by setting the stage for inquiries into specific instances reflecting defendant's character for aggression and violence:

*Q.* When you're in a position, Mr. Roper, that someone's saying something that you don't like or they're acting in a way that you don't like you aren't opposed to reacting to them with violence, isn't that true?

*A.* No, I am opposed.

After this the prosecutor asked defendant about an instance where he, Farmer, and Morrow's brother were "shot-gunning" beers in the bathroom. The prosecutor asked defendant if he threatened Farmer and Morrow's brother with the knife they were using to puncture the cans of beer after Farmer and Morrow's brother made comments to defendant and engaged in physical horseplay. Defendant admitted the incident, but denied that he threatened Farmer and Morrow's brother. Instead, he characterized his actions as part of the horseplay.

The prosecutor next asked defendant about several instances of violence involving his ex-girlfriend, Makela. She asked about an incident where he allegedly threw Makela against a tree and repeatedly shoved her down and told her to "stay down bitch." She also inquired about an incident where Makela barricaded herself in her bedroom and defendant broke in and attacked her. She also asked about a time when defendant purportedly left a party with Makela and became agitated with her, dragged her by her throat to the car, and eventually got on top of her, slammed her head into the concrete, and threatened to kill her.

The prosecutor's inquiries into these specific instances of conduct while cross-examining defendant were well within the scope of that which is permissible under MRE 405(a). Each of the inquires involved events where defendant became agitated after relatively minor provocation and then resorted to threats of physical violence or actually engaged in physical violence. Thus, this line of cross-examination served the proper pur-

pose of testing defendant's assertion about his peaceful character by suggesting that defendant's character is actually the opposite—he is aggressive and easily provoked to violence. And had the prosecutor limited her inquiries into specific conduct to this line of questioning, there would be no question that the prosecutor acted appropriately. However, this was not the end of the evidence concerning these specific instances of defendant's conduct.

After the defense rested, the prosecutor called Makela as a rebuttal witness. During her rebuttal testimony, Makela testified in detail about each of the incidents, and her testimony portrayed the incidents in more violent and degrading terms than were suggested by the questions the prosecutor posed to defendant. Indeed, Makela testified that defendant broke her arm during one incident, and in another he tricked her into thinking that he was hurt and then grabbed her and smeared blood in her face. Thus, Makela's testimony strongly suggested that defendant had an aggressive character and that, when defendant had been drinking, he was very easily provoked into fits of violence.

This case did not involve a charge or defense where defendant's character was an essential element. Accordingly, the prosecutor could not present evidence of specific instances of conduct for the purpose of proving defendant's character under MRE 405(b). Likewise, under MRE 405(a), the prosecutor could inquire into specific instances of conduct through defendant's cross-examination, but normally would not be able to call a witness to prove character through testimony regarding specific instances of conduct. Our Supreme Court emphasized this latter point in *Champion*, 411 Mich at 471.

In *Champion*, the defendant called two witnesses who testified that the defendant had a good reputation

in the community for truthfulness and veracity and for being a peaceful and law-abiding citizen. *Id.* at 469. On cross-examination of these witnesses, the prosecutor did not inquire into the witnesses' knowledge about specific instances of misconduct in which the defendant may have engaged. *Id.* Rather, the prosecutor called a rebuttal witness to testify about the defendant's use and sale of drugs. *Id.* at 470. Our Supreme Court held that, under MRE 405(a), the prosecutor could have tested the witnesses' knowledge of the defendant by asking them on cross-examination about specific instances of the defendant's conduct, but could not call a rebuttal witness to testify directly about the specific instances of misconduct. *Champion*, 411 Mich at 470-471. Rather, the rebuttal witness could only testify with regard to reputation. *Id.* at 471. For that reason, our Supreme Court reversed the defendant's conviction and ordered a new trial. *Id.*

However, the facts in *Champion* are different from the facts in this case in several important ways. Although the defendant in *Champion* placed his character at issue, he did not do so through his own testimony. As a result, the prosecutor in *Champion* did not cross-examine the defendant about specific instances of conduct as permitted under MRE 405(a), which the prosecutor in this case did. Likewise, in this case, defendant undermined the prosecutor's efforts to challenge his assertion regarding his character for aggression. Defendant initially denied any memory of the incidents with Makela, then denied specific conduct, and eventually began to deny the incidents altogether:

> *Q.* So it's your testimony that what happened . . . that those things never happened?
>
> *A.* Not in that way, ma'am.

*Q.* Well originally you said that you didn't remember them happening. So did they remember—

*A.* I remember—

*Q.* —did they happen or did they not happen, let's start with that?

*A.* Well if she has statements that said they were there then I'm sure that I was there with her. But I'm not—I'm not going to agree if that's the way that everything happened.

*Q.* Well your original testimony was that you didn't remember.

*A.* I don't remember exactly all the details. But not—

*Q.* But that doesn't mean it didn't happen then, does it?

*A.* —but I would remember—I think I would remember if I would do something like that. And no ma'am, I did not.

Thus, unlike the situation in *Champion,* the prosecutor in this case was left with a situation where she could not rebut defendant's denials without calling a witness to testify about the specific instances of conduct that defendant denied. The trial court implicitly relied on this difference when it recognized that defendant's testimony on cross-examination altered the nature of the prosecutor's permissible proofs. Indeed, when discussing whether the prosecutor would be able to call a rebuttal witness regarding the incident where defendant purportedly threatened Farmer and Morrow's brother with a knife, the trial court noted that defendant had admitted that incident. On the basis of that the trial court indicated that the witness's testimony "would have to be limited at this point just to [defendant's] dispute at the end of his testimony." Specifically, the trial court stated that the testimony would have to be limited to testimony "[r]egarding the fact that [defendant] was not joking around. He was serious." Consequently, in order to properly decide this issue, we

must first determine whether Michigan law recognizes an exception to the permissible forms of inquiry into character under MRE 405(a) under facts such as those present here—that is, whether a prosecutor may elicit testimony through a rebuttal witness concerning specific instances of conduct where a defendant places his character at issue on direct examination and then denies the occurrence of specific instances of conduct on cross-examination. We conclude that our Supreme Court recognized such an exception in *People v Vasher*, 449 Mich 494; 537 NW2d 168 (1995).

The defendant in *Vasher* was charged with three counts of first-degree criminal sexual conduct after he allegedly sexually penetrated his four-year-old granddaughter and two other three-year-old girls. *Id.* at 496. The defendant testified in his own defense and denied having assaulted the children. *Id.* On direct examination, the defendant's trial counsel asked the defendant if he had at any time engaged in sexual activity with any of the children. *Id.* at 502. The defendant answered that he did not: " 'None whatsoever. I love those children like they are my own. They call me grandpa, Paw-Paw Frank, because they love me.' " *Id.* at 502. On cross-examination, the prosecutor questioned the defendant about his sexual philosophy. Specifically, the prosecutor asked whether the defendant had told the mother of one of the victims " 'that girls of thirteen should have sex with men in the family such as uncles, fathers, grandfathers so they know what sex is like, know what good sex is?' " *Id.* at 498. The defendant denied that he had ever said that. *Id.*

After the defendant denied having told the victim's mother that he thought it was proper for men in a family to initiate the girls in the family to sexual activity, the prosecutor called the girl's mother as a

rebuttal witness. *Id.* at 503. She testified that, with regard to having sex with children, the defendant told her that " 'the farmers and the Indians used to break the children, so that in later life they would know whether they got a fair deal or not.' " *Id.* Further, when the prosecutor asked her whether the defendant had told her that " 'it was the right and duty of fathers, grandfathers, uncles to instruct young females so they would know what good sex was?' " *Id.* at 503-504. She responded: " 'Exactly.' " *Id.* at 504.

Writing for the majority, Justice WEAVER noted that the Court of Appeals had determined that this line of questioning was an improper impeachment based on character. *Id.* at 502. Justice WEAVER disagreed that the questioning was improper; she explained that the defendant had placed his character for being a loving family man who would not consider molesting young girls at issue when he stated that he loved the children as his own and asserted that they referred to him as " 'Paw-Paw Frank.' " *Id.* at 502-503. Thus, she concluded, the prosecution could properly question the defendant about his peculiar sexual philosophy under MRE 404(a)(1). Justice WEAVER then turned to the propriety of the prosecution's rebuttal witness.

In examining whether it was proper for the prosecutor to offer extrinsic evidence to impeach the defendant, Justice WEAVER noted that the general rule is that a witness may not be contradicted regarding collateral matters. *Id.* at 504. However, she concluded that the rebuttal testimony was not on a collateral matter:

> Here, the rebuttal evidence was narrowly focused on refuting defendant's denial that he had told Ms. Culkar about his belief that it was acceptable for family members to initiate young girls into sexual activity. This in turn was in direct response to defendant's testimony on direct examination in which he stated that he had not had sexual

> activity with the young girls because "I love those children like they are my own. They call me grandpa, Paw-Paw Frank, because they love me." Because this was a matter so closely bearing on defendant's guilt or innocence, it was not error for the prosecutor to have impeached defendant. [*Id.*]

Further, Justice WEAVER stated that it was not error for the prosecutor to have waited to present this evidence until the rebuttal phase of the trial. *Id.* at 504-505. She noted that where rebuttal testimony is "a simple contradiction of the defendant's testimony that directly tended to disprove the exact testimony given by the witness, it was proper rebuttal testimony." *Id.* at 505. Because the rebuttal testimony was not on a collateral matter and was limited to directly contradicting the defendant's denial, it was proper. *Id.* at 506.

Although the majority opinion did not frame the issue as an exception to the limitations on character evidence imposed by MRE 405, as was recognized by the dissenting justices, the majority opinion effectively creates an exception to the general rule that a party may not prove character through evidence of specific instances of conduct. Writing for the three dissenting justices, Justice CAVANAGH stated that he was suspicious of the conclusion that the defendant had placed his character at issue. *Id.* at 507. Nevertheless, even assuming that the defendant had put his character at issue, he stated that MRE 405 limited the form of the prosecutor's rebuttal. *Id.* at 507. Thus, he concluded, the only evidence that the prosecution could have presented on rebuttal was opinion or reputation evidence. *Id.* at 507-508. Justice CAVANAGH lamented that the majority's holding ignored MRE 405(a) and longstanding precedent: "With no discussion or analysis, the majority cavalierly casts aside over seventy years of this Court's precedent along with the Rules of Evidence by holding that specific instances of conduct may be used on

rebuttal to establish character." *Id.* at 509. Instead, he stated that he would have concluded that the prosecutor "was bound by the defendant's answer that he never told anyone that children should have sex with their male relatives, because this was a collateral matter, and a witness may not be impeached with extrinsic evidence on collateral matters." *Id.* at 512.

Under the majority's holding in *Vasher*, a prosecutor may present rebuttal evidence concerning specific instances of conduct to prove a defendant's character, notwithstanding the limitations imposed under MRE 405, when all the following are true: (1) the defendant places his or her character at issue through testimony on direct examination; (2) the prosecution cross-examines the defendant about specific instances of conduct tending to show that the defendant did not have the character trait he or she asserted on direct examination; (3) the defendant denies the specific instances raised by the prosecution in whole or in part during the cross-examination; and (4) the prosecution's rebuttal testimony is limited to contradicting the defendant's testimony on cross-examination. *Vasher*, 449 Mich at 504-506.

In this case, defendant clearly put his character for aggression at issue on direct examination. He effectively invited the jury to conclude that he must have suffered adequate provocation because he was not the type of person who would want to hurt people—especially friends. Further, when the prosecutor cross-examined defendant about specific instances of conduct that tended to show that he had an aggressive character, defendant repeatedly denied the relevant conduct. Therefore, the prosecutor could properly call Makela to testify about the specific instances denied by defendant on cross-examination. *Id.*

### D. MRE 403

Defendant also argues that the prosecutor's rebuttal testimony concerning specific instances of defendant's conduct was highly prejudicial and should have been excluded under MRE 403. Otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403. In this case, the rebuttal testimony was highly probative of defendant's character for aggression. Further, although there is always a risk that the jury will give character evidence undue weight or use it for an improper purpose, see *VanderVliet*, 444 Mich at 72-73, we do not agree that the probative value of the evidence was "substantially outweighed by the danger of unfair prejudice . . . ." MRE 403. Finally, we find it noteworthy that, consistently with MRE 105, the trial court instructed the jury that it could only use the evidence concerning the incident in the bathroom and the incidents with Makela when considering defendant's character for aggression or peacefulness:

> You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the defendant is a bad person or that he is likely to commit crimes. You must not convict the defendant here because you think he is guilty of other bad conduct. All the evidence must convince you beyond a reasonable doubt that the defendant committed the alleged crime or you must find him not guilty.

We believe that this instruction properly safeguarded defendant's rights. *VanderVliet*, 444 Mich at 74-75.

### IV. CONCLUSION

The evidence adequately supported the jury's verdict, and the verdict was not against the great weight of

the evidence. Moreover, the trial court did not err when it concluded that defendant had placed his character for aggression at issue and did not err when it permitted the prosecutor to call a rebuttal witness to testify concerning the specific instances of conduct denied by defendant on cross-examination. We also reject defendant's contention that the prosecutor engaged in misconduct by cross-examining defendant about the specific instances of conduct and calling a rebuttal witness to contradict defendant's denials. The prosecutor's questions and decision to call a rebuttal witness were proper.

There were no errors warranting relief.

Affirmed.