*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
August 8, 2019

Plaintiff-Appellee,

v

No. 344493
Wayne Circuit Court
LC No. 17-010562-01-FC

DEANDRE ALBERT MARTIN,

Defendant-Appellant.

Before: LETICA, P.J., and M. J. KELLY and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals by right his convictions, following a bench trial, of second-degree murder, MCL 750.317, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to 22 to 40 years' imprisonment for his second-degree murder conviction, to be served consecutively to two years' imprisonment for his felony-firearm conviction. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On the evening of September 8, 2017, defendant and Algernon Ladre Moore, Jr. attended a candlelight vigil for Moore's father. Although the vigil was peaceful, defendant was armed with a large handgun that he referred to as a "Draco" gun; the gun was visible to several witnesses.[1] Defendant eventually left the vigil with the Moore, Moore's mother Roshawandra McGowan, and McGowan's friend Lakeisha Vance, and went to a gathering at the home of Chardawna Layne (Chardawna), located on Washburn Street in Detroit. Defendant still had the gun at the Washburn location. Several people asked him to put the gun away, but he did not do so.

---

[1] The Century Arms Corporation manufactures a "Draco AK pistol," a semi-automatic pistol crafted to resemble an AK-47 rifle. See https://www.centuryarms.com/draco-pistol.html (last accessed July 9, 2019).

Chynna Pitts and Chardawna's cousin Alexis Layne (Alexis) also arrived at Chardawna's home that evening in Pitts's truck. Pitts parked across the street from the home. Chardawna came outside to speak to Alexis and joined Pitts and Alexis in the truck. They conversed inside the truck until around 2:30 a.m.

At about that time, McGowan and Vance left the Washburn Street house and got into defendant's truck. Defendant and Moore then exited the house; defendant went to the driver's side of the truck where McGowan was seated, and Moore went to the passenger's side where Vance was seated. Moore and Vance conversed, as did defendant and McGowan. The conversation between defendant and McGowan involved how McGowan was going to get home.

At some point, Moore interjected into defendant's and McGowan's conversation; defendant apparently took offense at this, responding, "[Y]ou know, mind your business. Stay out of grown folks' business." Moore came over to the driver's side door and exchanged more words with defendant; Moore and defendant ultimately became involved in a physical altercation. McGowan saw defendant grab Moore's throat, while Vance could only see defendant's hand stretched out toward Moore. Defendant had the gun pointed downward in his other hand. McGowan tried to get out of the truck but could not open the door. McGowan climbed out of the window while telling them to "chill out." McGowan and Vance saw defendant raise the gun and McGowan saw a flash from the gun. Alexis saw defendant raise the gun up, but she quickly hid underneath Pitts's truck for safety. Alexis and Pitts heard a gunshot. Chardawna did not see the gun go off or where the gun was before it went off.

Moore was shot. McGowan and Alexis began performing emergency lifesaving procedures on Moore after McGowan could not find a pulse. Chardawna told defendant, who was still holding his gun, to leave. Defendant walked over to his truck and told Vance to "get out the car." Vance got out of the truck and called 911. Defendant got into the truck and "pulled off real fast." Moore was transported to the hospital, where he was pronounced dead.

Defendant testified at trial and admitted to having a Draco gun on the day in question. He also admitted to drinking four or five cups of vodka that night. He testified that he was holding the gun downward as he and Moore began "tussling," but that Moore grabbed the gun, they began pulling it back and forth, and the gun went off during the struggle. Defendant stated that he did not intend for the gun to go off and did not intentionally put his finger on the trigger; according to defendant, his "finger went to the trigger" because of the pulling back and forth. Defendant characterized the shooting as an accident and claimed not to have known that Moore was shot when he left the Washburn Street location.

After leaving the scene of the shooting, defendant did not call 911. He admitted that he "got rid of" the gun by throwing it "in the street" "[o]ver the freeway" because he did not have a license to carry the weapon.

The trial court convicted defendant as described. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence of the requisite intent for a second-degree murder conviction. Instead, defendant asserts that he is guilty only of involuntary manslaughter because he was grossly negligent. We disagree.

> "In determining whether sufficient evidence exists to sustain a conviction, this Court reviews the evidence in the light most favorable to the prosecution, and considers whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." But more importantly, "[t]he standard of review is deferential: a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the jury verdict. The scope of review is the same whether the evidence is direct or circumstantial. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." "It is for the trier of fact, *not the appellate court*, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." [*People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (citations omitted).]

"[M]inimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).

The elements of second-degree murder are "(1) a death, (2) the death was caused by an act of the defendant, (3) the defendant acted with malice, and (4) the defendant did not have lawful justification or excuse for causing the death." *People v Smith*, 478 Mich 64, 70; 731 NW2d 411 (2007). Defendant only challenges the third element, whether he possessed the requisite state of mind. Defendant argues that the shooting was "a pure accident," that "[t]here was never an intent to kill or do great bodily harm to [t]he victim," and that defendant's "actions, including carrying the gun throughout the evening, d[id] not create a very high risk of death or great bodily harm that death or such harm would likely follow."

We conclude that sufficient evidence was presented at trial for a reasonable trier of fact to find that defendant possessed the intent required for a second-degree murder conviction. Manslaughter is murder without malice. *Smith*, 478 Mich at 74. Malice is "the intent to kill, the intent to cause great bodily harm, or the intent to commit an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998). Because malice may be found by evidence of a defendant's wanton and willful disregard for human life, "[t]he offense of second-degree murder does not require an actual intent to harm or kill, but only the intent to do an act that is in obvious disregard of life-endangering consequences." *People v Roper*, 286 Mich App 77, 84; 777 NW2d 483 (2009) (quotation marks and citation omitted). "Malice may be inferred from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *Roper*, 286 Mich App at 84.

The evidence was sufficient to establish malice. Malice may be inferred from the use of a deadly weapon. *Roper*, 286 Mich App at 84-86; see also *People v Bulls*, 262 Mich App 618,

627; 687 NW2d 159 (2004). Defendant used a firearm to shoot Moore. Moreover, defendant carried the gun all evening, despite multiple requests to put the gun away and his consumption of a large amount of alcohol. Defendant testified that he had his finger near the trigger as he argued with Moore and that he knew the gun was loaded. McGowan testified that defendant initiated the physical encounter by grabbing Moore's throat. Additionally, although defendant claims that the shooting was an accident resulting from an unexpected struggle for the gun, the prosecutor presented evidence to indicate that defendant raised the gun before physically struggling with Moore. McGowan testified that defendant and Moore were apart when defendant raised the gun. And Moore's autopsy revealed no evidence of close-range firing on the skin surrounding the wound, supporting the inference that there was some distance between Moore and the gun when it was fired. In sum, the evidence was sufficient to allow the trial court to conclude that defendant intended to kill or cause great bodily harm to Moore by shooting him during a fight. See *Goecke*, 457 Mich at 464. Even if defendant did not have the specific intent to kill or cause great bodily harm, defendant's acts of starting a physical altercation while intoxicated and holding a loaded gun with his finger near the trigger was evidence of an "obvious disregard of life-endangering consequences." *Goecke*, 457 Mich at 466.

Moreover, defendant's intent may be inferred from the fact that, after he shot Moore, he immediately left the scene and got rid of the gun. Defendant did not call the police or emergency services after the shooting, nor did he come forward when he learned that Moore had died. See *People v Henderson*, 306 Mich App 1, 12; 854 NW2d 234 (2014) (noting that evidence of postoffense conduct that included flight and disposal of firearms supported the defendant's conviction of second-degree murder). Accordingly, the evidence was sufficient for the trial court to conclude that defendant had malicious intent, thus satisfying the third element of second-degree murder.

Additionally, defendant contends that McGowan's trial testimony conflicted with her statement to the police, and that Vance's trial testimony conflicted with her preliminary examination testimony. However, on appeal, "[t]his Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *Kanaan*, 278 Mich App at 618-619.

### III. SENTENCING GUIDELINES

Defendant argues that, if this Court concludes there was insufficient evidence to support his second-degree murder conviction, then the trial court would have erroneously assessed 10 points for Prior Record Variable (PRV) 6 and 25 points for Offense Variable (OV) 6, as each should be assessed zero points if he were to be resentenced for involuntary manslaughter following a remand order from this Court. Defendant concedes that the "[t]he corrections proposed do not affect the guideline scoring for second[-]degree murder." As discussed, defendant was properly convicted of second-degree murder, instead of involuntary manslaughter. Defendant's proposed scoring corrections would not affect his appropriate guidelines range for second-degree murder, and remand for resentencing is therefore not required. MCL 769.34(10); *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006) ("Where a scoring error does not alter the appropriate guidelines range, resentencing is not required.").

Affirmed.

/s/ Anica Letica
/s/ Michael J. Kelly
/s/ Mark T. Boonstra