# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MATTI JAMES RICKERT,

Defendant-Appellant.

UNPUBLISHED
April 17, 2018

No. 336956
Jackson Circuit Court
LC No. 15-004856-FH

Before: SAWYER, P.J., and BORRELLO and SERVITTO, JJ.

PER CURIAM.

Defendant, Matti James Rickert, appeals as of right his jury convictions of home invasion in the first degree, MCL 750.110a(2); aggravated stalking, MCL 750.411i(2); two counts of assault with a dangerous weapon without intending to commit murder or inflict great bodily harm (felonious assault), MCL 750.82(1); domestic assault, MCL 750.81(2); and impeding, interfering, preventing, or obstructing a witness's ability to attend, testify, or provide information at an official proceeding (impeding a witness), MCL 750.122(6). We affirm.

## I. OTHER-ACTS TESTIMONY

Rickert's convictions arise from acts that he committed against Dawn Mayett, who was the mother of his two daughters, over the course of two days in May 2015, in addition to communications that he subsequently made from jail while awaiting trial. Rickert first argues on appeal that the trial court should not have allowed two of his former girlfriends, Lisa Baker and Danielle Fowler, to testify about the acts of domestic violence that he committed against them. More specifically, he claims that their testimony was unfairly prejudicial and should have been barred pursuant to MRE 403.

This Court reviews a trial court's decision to allow the admission of evidence for an abuse of discretion. *People v Roper*, 286 Mich App 77, 90; 777 NW2d 483 (2009). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *People v Yost*, 278 Mich App 341, 379; 749 NW2d 753 (2008). This Court, however, reviews de novo whether the trial court properly interpreted and applied the relevant statutes and rules of evidence. *People v Pattison*, 276 Mich App 613, 615; 741 NW2d 558 (2007). A trial court necessarily abuses its discretion when it premises its decision on an error of law. *People v Everett*, 318 Mich App 511, 516; 899 NW2d 94 (2017).

-1-

Generally, a prosecutor may not call a witness to testify about a defendant's character, or present testimony of other acts performed by the defendant, in order to show that the defendant has bad character and that he or she acted in conformity with his or her character. See *Roper*, 286 Mich App at 91. Although the rules of evidence generally exclude evidence of other acts solely to prove a defendant's propensity to commit such acts, our Legislature has determined that evidence may be admitted for that purpose in cases involving domestic violence: "In a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403." MCL 768.27b(1). Domestic violence is defined to mean—in relevant part—causing or attempting to cause physical or mental harm; placing a household member in fear of physical or mental harm; causing or attempting to cause a household member to engage in involuntary sexual activity by force, threat of force, or duress; and engaging in any activity toward a household member that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested. MCL 768.27b(5)(a). With the enactment of this statute, the Legislature expanded admissibility of other-acts evidence beyond that provided under MRE 404(b)(1). See *People v Mack*, 493 Mich 1, 2-3; 825 NW2d 541 (2012). Such evidence can be admitted to prove any relevant fact, including proving a defendant's propensity to commit the crimes at issue, unless barred under MRE 403. See *People v Daniels*, 311 Mich App 257, 272; 874 NW2d 732 (2015).

In this case, there was extensive evidence about Rickert's prior acts that implicated his propensity to commit acts of domestic violence, which encompassed crimes similar to those at issue at trial.[1] The jury heard testimony that Rickert tended to enter the homes of his domestic partners without regard to whether he had permission and would, when necessary, force entry. The jury heard that Rickert habitually threatened his domestic partners—sometimes with a knife—and threatened their families. He used such threats, the jury heard, to gain compliance with his wishes and control his domestic partners. He also used physical intimidation and threats to coerce sex. The jury heard that Rickert was very jealous of other men and tried to control the women in his life by monitoring their communications and movements. He would also stalk them out of fear that his domestic partners were with other men—even to the point of quitting his job and driving six hours to confront his girlfriend and determine whether she was with another man. The jury heard that he went to such extreme lengths because his girlfriend did not timely answer his communications.

The testimony was highly relevant to several facts at issue. See MRE 401 (defining relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). The evidence that Rickert would enter into the homes of his domestic partners without permission and by force, when necessary, tended to reinforce the testimony by Mayett and her daughters, KR and AR, that Rickert was not invited into their home on the days in question. Indeed, both KR and AR testified that Rickert would just show up at random and enter their home without knocking or requesting permission. Mayett also testified that, even if

---

[1] Rickert has not challenged the evidence of his cocaine use on appeal.

the door were closed and locked, she felt compelled to let him in, even if she did not wish to do so, because he would pound on the door and gain entry anyway. The testimony that Rickert had done the same thing to another domestic partner made it more likely that Mayett accurately described the events at issue; that is, the evidence tended to make it more likely that Rickert entered a "dwelling without permission" on the days at issue than it would be without that evidence. See MCL 750.110a(2); MRE 401. Thus, it was relevant and admissible to prove that Rickert did not have actual or implied consent to enter Mayett's dwelling, and yet entered her dwelling without permission, as was his propensity with domestic partners. MCL 768.27b(1); MRE 401; MRE 402.

The jury also heard testimony that Rickert routinely became angry and threatened violence or used violence with his domestic partners when they did not comply with his wishes or during moments of jealously and insecurity. They heard that he had brandished a knife in the past under such circumstances. This testimony tended to make it more likely that Mayett accurately characterized Rickert's actions when she testified that he brandished a meat fork and a knife after entering her home uninvited. She explained that he felt that she was secretly meeting with another man. The jury also heard testimony that he wanted sexual favors from Mayett and used a meat fork during an incident in the bedroom after Mayett refused his advances. The evidence of his prior threats and acts involving knives under similar circumstances tended to make it more likely that Rickert actually used the meat fork and knife to place Mayett in fear of an immediate battery and that his acts were not accidental. See MCL 750.82(1); *People v Johnson*, 407 Mich 196, 217-218; 284 NW2d 718 (1979) (stating that the elements of felonious assault are an assault and the use of a dangerous weapon in the assault); *People v Gardner*, 402 Mich 460, 479; 265 NW2d 1 (1978) (citation omitted) (stating that an assault is an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery). Thus, the evidence was relevant and admissible to show not only that Rickert had a propensity to use knives and other dangerous weapons to assault his domestic partners, which is proper purpose for admission under MCL 768.27b(1), but also to prove his motive, intent, and the absence of mistake. See MRE 404(b)(1) (stating that evidence of other acts may be admitted to prove motive, intent, and absence of mistake or accident). The evidence tended to show that Rickert would routinely resort to such violence to control his domestic partners, to prevent them from leaving him, and to compel compliance with sexual demands.

Finally, the evidence that Rickert was consumed by jealousy and would resort to extreme behaviors when he felt that his domestic partners might be unfaithful tended to establish Rickert's motive for harassing, terrorizing, frightening, and intimidating Mayett on the days at issue. See *People v Rice*, 235 Mich App 429, 440; 597 NW2d 843 (1999) (stating that proof of motive is always relevant and may be proved using other-acts evidence). The evidence also permitted an inference that his acts were willful. See MCL 750.411i(e) (defining stalking to mean "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested"). There was evidence that Rickert entered Mayett's home without permission and harangued her, that he later took her phone and her purse, that he physically blocked her from leaving her home, that he terrorized her with his car, and that he physically threatened her with a meat fork/knife. For each incident, there was evidence that Rickert was motivated by fear that Mayett was seeing someone else.

Although admissible, the trial court had the obligation to bar the evidence if it determined that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice under MRE 403. See MCL 768.27b(1); see also *People v Watkins*, 491 Mich 450, 484-486; 818 NW2d 296 (2012) (discussing the differences between MCL 768.27a and MCL 768.27b, and noting that MCL 768.27b does not include permissive language, which suggests that the Legislature required trial court to allow the admission of evidence of other acts of domestic violence subject only to MRE 403). Relevant evidence may be excluded under MRE 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The testimony concerning Rickert's propensity to commit acts of domestic violence and the surrounding circumstances of those acts was clearly prejudicial. That alone, however, was insufficient to bar their admission. "All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995). Rather, evidence should be excluded only where there is a danger that marginally probative evidence would be given undue weight—that is, where "evidence which is minimally damaging in logic will be weighed by the jurors substantially out of proportion to its logically damaging effect." *Id.* at 75-76 (quotation marks and citation omitted).

Here, the evidence was highly probative of both Rickert's propensity to commit such acts and probative of his motive and intent in doing so. Although Baker tended to describe the incidents involving her in more graphic terms—even characterizing the incident involving Rickert's request for sex as rape—the jury heard testimony that allowed it to accurately assess the weight and credibility of the other-acts testimony. Baker even described speaking with a family member afterward and questioning whether she had in fact consented to the encounter. The jury also heard Mayett describe similar incidents where Rickert wanted sex and she acquiesced under circumstances tending to suggest that it was not truly consensual. Thus, Baker's testimony was not so different in degree from Mayett's description of similar acts that it was likely to inflame the jury's passions. Further, the trial court instructed the jury that it must first find that Rickert committed the other acts of domestic violence before it could consider that evidence and then it instructed the jury that it could only use the evidence when deciding whether Rickert committed the offenses for which he was on trial. That instruction mitigated the danger that the jury would give undue weight to the other-acts evidence. See *People v Cameron*, 291 Mich App 599, 612; 806 NW2d 371 (2011). Under the circumstances it cannot be said that the danger of unfair prejudice *substantially o*utweighed the probative value of this evidence. MRE 403.

Finally, Rickert suggests that the other-acts testimony by Baker and Fowler was unfairly prejudicial because it was difficult for him to obtain evidence to challenge their version of events. The admissibility of evidence is a matter of relevance and unfair prejudice. See MRE 401; MRE 402; MRE 403. It does not depend on whether the party opposing the admission of the evidence has had the opportunity to discover evidence that might undermine the weight and credibility of the evidence to be admitted. In any event, the prosecution disclosed the police reports relevant to Baker's testimony, and there was otherwise no indication that the defense did not have an adequate opportunity to conduct discovery on the other-acts evidence. And, defense

counsel thoroughly cross-examined both witnesses about the incidents at issue. The trial court did not abuse its discretion when it allowed the testimony about other acts of domestic violence and the circumstances surrounding those incidents. *Roper*, 286 Mich App at 90.

## II. EXPERT TESTIMONY

Rickert next argues that the trial court erred when it allowed retired detective Gary Schuette to testify as an expert on the dynamics of domestic violence. We disagree.

The trial court has the discretion to determine whether a witness has the necessary qualifications and may testify as an expert. *Gay v Select Specialty Hosp*, 295 Mich App 284, 290; 813 NW2d 354 (2012). Nevertheless, "trial courts must—at every stage of the litigation—serve as the gatekeepers who ensure that the expert and his or her proposed testimony meet the threshold requirements." *Id.* at 291. Although trial courts have discretion to determine whether a witness is qualified to testify as an expert, the court must accurately apply the law when exercising that discretion. *Id.* And this Court reviews de novo whether the trial court properly selected, interpreted, and applied the law. *Id.* If the trial court admits or excludes an expert on the basis of an erroneous application of the law, it necessarily abuses its discretion. *Id.* at 292.

If a trial court "determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue," the trial court may permit "a witness qualified as an expert by knowledge, skill, experience, training, or education" to testify "in the form of an opinion or otherwise." MRE 702. For example, expert testimony concerning syndrome evidence "is sometimes necessary to explain behavioral signs that may confuse a jury so that it believes" that the witness's behavior is inconsistent with an ordinary victim. *People v Peterson*, 450 Mich 349, 362; 537 NW2d 857 (1995). "[C]ertain groups of people are known to exhibit types of behavior that are contrary to common sense and are not within the average person's understanding of human behavior. In these instances, an expert's specialized testimony may enlighten the jury so that it can intelligently evaluate an experience that is otherwise foreign." *People v Kowalski*, 492 Mich 106, 124; 821 NW2d 14 (2012).

Our Supreme Court has held that expert testimony might be helpful to explain specific behaviors by persons involved in domestic violence. See *People v Christel*, 449 Mich 578, 591; 537 NW2d 194 (1995). Expert testimony "is needed," the Court explained, "when a witness' actions or responses are incomprehensible to average people." *Id.* at 592. Expert testimony is particularly helpful in situations where the defense contends that the victim's behaviors are inconsistent with being an actual victim—such as by arguing that an actual abuse victim would have sought medical help, would have called the police department, or would have ended the relationship rather than endure prolonged abuse. *Id.* at 594 (citation omitted). Expert testimony might also be helpful to explain why a victim of domestic violence might hide or minimize the abuse, might delay reporting abuse to friends or authorities, or might deny the abuse outright. *Id.* at 592. In this case, there was testimony that both Mayett and Baker engaged in behaviors that appeared to be inconsistent with being an actual victim of domestic violence.

Mayett testified that she endured abuse by Rickert for 20 years and that she did not discuss it with her parents or others or call the police department until the events at issue. She also took steps to hide Rickert's abuse from public observation. For example, when she realized

that Rickert was following her to the location where KR was going to be taking pictures, she did not stop there. Instead, she drove to a parking lot at a nearby golf course where she was—in effect—in more danger than if she had gotten out and stood with the other parents. She did the same thing at the soccer game. She walked away from the field and returned to the parking lot in order to avoid embarrassment. There was also testimony that Rickert routinely showed up at her home without permission and when she did not want him there, yet she did not take steps to bar his entry. She did not lock the door and on some occasions even let him. She explained that she would let him in because she felt he would get in anyway. She even did not take steps to prevent him from staying overnight and sleeping in her bed. She also testified that she would on occasion acquiesce to his demands for sex in order to avoid conflict. Finally, Mayett appeared to minimize the level of violence implicated in Rickert's behaviors. She suggested that Rickert did not know that he scratched her with the meat fork as though it were normal for a man to bring a meat fork into the bedroom and wield it in a way that he could inadvertently scratch a domestic partner through clothing. She also expressed the belief that she was partially at fault for the abuse.

Mayett's behaviors are inexplicable to the ordinary person who has not been subjected to repeated abuse. The behaviors appear inconsistent with being an actual victim of home invasion, felonious assault, and stalking. Indeed, defense counsel argued in his closing that Mayett's actions were inconsistent with her claims that she did not consent to Rickert's presence in her home, and belied her claims that she was in fear of an imminent battery when he brandished the meat fork and knife. Accordingly, the trial court did not err when it determined that expert testimony might be helpful to the jury when evaluating the import of Mayett's testimony. MRE 702; *Christel*, 449 Mich at 591-594.

Although the charges at issue did not involve Rickert's abuse of Baker, her behaviors were also at issue. The jury had to assess her credibility to determine whether the incidents she described actually occurred, which it had to find before it could consider her testimony when determining whether Rickert committed the acts involving Mayett. See *People v VanderVliet*, 444 Mich 52, 68-69 n 20; 508 NW2d 114 (1993); see also MRE 104(b). Baker's credibility was plainly relevant, see *People v Layher*, 464 Mich 756, 764; 631 NW2d 281 (2001), and the jury could not fairly assess her credibility and the inferences to be drawn from her testimony without expert testimony. Like Mayett, Baker testified that she endured abuse at Rickert's hands. She also acquiesced to Rickert's demands for sex out of fear. She also suddenly dropped her rape case against him and then decided to move to another state with him despite the recent rape and despite past acts of domestic violence. She then allowed Rickert to isolate her and threaten her. When she finally escaped, she again interacted with Rickert after he tracked her down. Her behaviors, like Mayett's behaviors, were illogical and appeared inconsistent with being an actual victim of domestic violence. Therefore, although the trial court did not expressly address this alternate basis, expert testimony would also be helpful to the jury's assessment of Baker's credibility and testimony and the trial court did not err in its determination that expert testimony would be helpful. MRE 702; *Christel*, 449 Mich at 591-594.

The trial court also did not abuse its discretion when it determined that Schuette was qualified to offer expert testimony on the kinds of behaviors that the victims of domestic violence will commonly exhibit. An expert may be qualified by "knowledge, skill, experience, training, or education." MRE 702. Although the typical expert on domestic violence might have

a degree in a relevant field, a formal education is not a prerequisite to being qualified as an expert. See MRE 702; *People v Whitfield*, 425 Mich 116, 123; 388 NW2d 206 (1986) (citation omitted) (providing that courts should not apply an overly narrow test of qualifications to exclude an expert witness). Indeed, a witness may be qualified as an expert through special knowledge obtained during his or her employment. See *People v King*, 58 Mich App 390, 399; 228 NW2d 391 (1975). Indeed, as this Court has explained, "[i]t is possible that someone with practical experience will be more of an expert witness than one with academic training in the area." *People v Boyd*, 65 Mich App 11, 15; 236 NW2d 744 (1975) (holding that a heroin addict, who had used heroin hundreds of times, could be qualified as an expert on the identification of heroin and that questions regarding her qualifications were properly a matter of weight and credibility—not admissibility).

In this case, the trial court recognized that Schuette did not obtain his knowledge of the dynamics involved in domestic violence through a formal degree or certification program. Instead, he attended seminars and received training in domestic violence through his work as a police officer. But the trial court also recognized that Schuette had applied the concepts imparted during that training to hundreds, if not thousands, of actual investigations involving domestic violence. This practical experience augmented Schuette's training and qualified him to offer expert opinion on the kinds of behaviors commonly exhibited by the victims of domestic violence. MRE 702. Any limitations in his education went to the weight and credibility of his testimony, not its admissibility. *Boyd*, 65 Mich App at 15-16.

## III. CONTINUANCE FOR SENTENCING

Rickert next argues that the trial court erred when it denied his motion for a continuance to allow the judge who presided over his trial to return from maternity leave so that she could also sentence him. We disagree.

This Court reviews a trial court's decision to grant a continuance for an abuse of discretion. See *People v Wilson*, 397 Mich 76, 80; 243 NW2d 257 (1976). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Yost*, 278 Mich App at 379. This Court reviews de novo whether the trial court properly interpreted and applied the court rules. *People v Lee*, 489 Mich 289, 295; 803 NW2d 165 (2011) (citation omitted). When the trial court premises its exercise of discretion on an error of law, it necessarily abuses its discretion. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

There is no constitutional or statutory right to be sentenced by a particular judge. See *People v McKinley*, 5 Mich App 230, 237; 146 NW2d 142 (1966). Nevertheless, Michigan courts recognize that the same judge who presided over a defendant's trial should normally sentence the defendant, if reasonably available to do so. See *People v Humble*, 146 Mich App 198, 200; 379 NW2d 422 (1985). This is to ensure that the judge has sufficient familiarity with the facts of the case to tailor a sentence that is proportionate to the offender and offense. *People v Pierce*, 158 Mich App 113, 115-116; 404 NW2d 230 (1987). The court rules also generally provide that a new judge may perform the duties of the judge before whom an action has been tried, if that judge is no longer able to do so as a result of disability. See MCR 2.630 and MCR 6.440.

On appeal, Rickert argues that the trial court erred as a matter of law by denying his motion for a continuance because the prior judge's maternity leave did not amount to a disability within the meaning of MCR 2.630. That court rule provides:

> If, after a verdict is returned or findings of fact and conclusions of law are filed, the judge before whom an action has been tried is unable to perform the duties prescribed by these rules because of death, illness, or other disability, another judge regularly sitting in or assigned to the court in which the action was tried may perform those duties. However, if the substitute judge is not satisfied that he or she can do so, the substitute judge may grant a new trial. [MCR 2.630.]

More specifically, Rickert maintains that the term "disability" must be construed in light of the preceding terms to mean something akin to death or illness, and he contends that maternity leave does not rise to the level of death or illness. MCR 2.630; see also *People v Vasquez*, 465 Mich 83, 89; 631 NW2d 711 (2001) (stating that courts generally construe terms in context and give terms grouped in a list a related meaning). Examining the terms in context, it is not clear that maternity leave does not amount to a disability at least akin to the kinds of illnesses that might disable a judge from presiding at sentencing. In any event, as the prosecutor correctly noted on appeal, MCR 2.630 is not the applicable court rule. Rather, because the rules of criminal procedure provide for a successor judge under MCR 6.440, that rule controls. See MCR 6.001(D)(3) (stating that civil rules of procedure generally apply to criminal cases except where the criminal rules of procedure or a statute provides a "like or different procedure").

Under MCR 6.440(A), a successor judge may "proceed with and complete the trial" if the "judge before whom the jury trial has" was unable to continue with the trial as a result of "death, sickness, or other disability" and the successor judge certifies that he or she is familiar with the record. By contrast, a successor judge may preside over any postverdict proceeding in a criminal case if "the trial judge because of disability becomes unable to perform the remaining duties the court must perform." MCR 6.440(C). Thus, with regard to postverdict proceedings, our Supreme Court eliminated the references to death or illness. It also did not require the successor judge to certify that he or she was familiar with the record but provided that the successor judge may grant a new trial if he or she is not satisfied that he or she will be able to perform the required duties as a result of not having presided over the trial. MCR 6.440(C).

Because our Supreme Court chose not to include the terms "death" or "illness" as grounds for a successor judge in a postverdict proceeding, there is no basis for construing the term "disability" to refer to something akin to "death" or "illness." See *Vasquez*, 465 Mich at 89. Rather, the term should be given its ordinary meaning. See *People v Zajaczkowski*, 493 Mich 6, 13; 825 NW2d 554 (2012). The term "disability" frequently refers to a limitation caused by a physical or mental impairment, but it can also refer more broadly to any disqualification, restriction, or disadvantage that prevents performance. See *Merriam-Webster's Collegiate Dictionary* (11th ed). In this case, the judge who presided over Rickert's trial was unavailable at sentencing because she was on maternity leave. A parent's need to leave work for a time to care for a newborn child, even if it does not involve a physical or mental impairment, amounts to a disqualification, restriction, or disadvantage that prevents performance. Therefore, to the extent that the successor judge determined that maternity leave amounted to a disability within the meaning of the court rule, he did not err.

Rickert also suggests that the trial court should have granted his motion for a continuance because he was willing to wait until the other judge returned from her maternity leave. While Rickert's willingness to waive his right to be sentenced within a reasonably prompt time was certainly a factor that the successor judge could consider, see *People v Smith*, 496 Mich 133, 142-143; 852 NW2d 127 (2014) (recognizing that a defendant's right to a speedy trial includes the right to be sentenced within a reasonably prompt time), it was not dispositive. The trial court retained broad discretion to control its docket and could properly consider its calendar management among other things when determining whether to grant a continuance. See *People v Grove*, 455 Mich 439, 466-469; 566 NW2d 547 (1997), superseded by court rule not in relevant part as stated in *People v Franklin*, 491 Mich 916; 813 NW2d 285 (2012).

In addition, there is no indication in the record that the successor judge was unfamiliar with the case or otherwise incapable of imposing a sentence that was proportionate to offender and offense. See *Pierce*, 158 Mich App at 115-116. Finally, the successor judge sentenced Rickert within the range recommended under the advisory sentencing guidelines. As such, Rickert's sentence was presumptively proportionate and, absent an error in scoring, must be affirmed on appeal. *People v Jackson*, 320 Mich App 514, 527; 907 NW2d 865 (2017). For that reason, even if the trial court should have granted the motion, Rickert cannot show that the decision prejudiced his sentencing. See *Wilson*, 397 Mich at 81(stating that the defendant bears the burden to show that the failure to grant the continuance caused prejudice).

## IV. OFFENSE VARIABLE 1

Rickert next argues that the trial court erred when it assigned 25 points to Offense Variable (OV) 1. He maintains that the trial court could not assign 25 points because the scratch suffered by Mayett did not occur during the home invasion and because the evidence showed that it was accidental. Although defense counsel objected to the score at sentencing, he did not argue these same grounds. Therefore, Rickert did not preserve this claim of error for appellate review. See *People v Kimble*, 470 Mich 305, 309; 684 NW2d 669 (2004) (stating that an objection to the scoring of a sentencing variable on one ground is insufficient to preserve an appellate attack on a different ground).

This Court reviews for clear error the trial court's factual findings in support of a particular score under the sentencing guidelines, which must be supported by a preponderance of the evidence. *People v Gloster*, 499 Mich 199, 204; 880 NW2d 776 (2016). This Court reviews de novo whether the trial court properly interpreted and applied the sentencing guidelines to the facts. *Id*. This Court, however, reviews unpreserved scoring challenges for plain error affecting the defendant's substantial rights. *Kimble*, 470 Mich at 312.[2] In order to warrant relief, the defendant must show that the trial court committed a plain or obvious error and that the error affected the outcome. *Id*.

---

[2] Although the sentencing guidelines are now advisory, trial courts must still accurately score the guidelines and consult them when imposing sentence. See *People v Lockridge*, 498 Mich 358, 392, 392 n 28; 870 NW2d 502 (2015).

MCL 777.31 addresses a defendant's aggravated use of a weapon. The trial court must assign 25 points under OV 1 if "[a] firearm was discharged at or toward a human being or a victim was cut or stabbed with a knife or other cutting or stabbing instrument." MCL 777.31(1)(a).

Rickert correctly notes that the trial court had to score OV 1 on the basis of conduct that occurred during the commission of the sentencing offense. See *People v McGraw*, 484 Mich 120, 122; 771 NW2d 655 (2009). The testimony and evidence, however, supports the conclusion that Mayett sustained the scratch during the commission of the home invasion.

At trial, there was evidence that Rickert repeatedly gained entry to Mayett's home without permission on the two days in question. The first entry without permission that established all the elements of first-degree home invasion, however, occurred when Mayett returned home after observing KR take her prom pictures. Mayett testified that Rickert followed her home and came in after her, despite her effort to close the door on him, and even though she told him he could leave. She stated that he then pushed her up against a wall and threatened her with the meat fork. Rickert remained in her home after this incident and continued to harass her. Mayett testified that Rickert followed her to bed and, when she refused his sexual advances, he whipped her around and tried to remove her pajama pants. During this struggle, he scraped her leg with the meat fork. Mayett testified that he did not leave the home until the next morning. A photograph taken the next day showed the extent of the scratch.

On appeal, Rickert apparently concedes that the relevant entry without permission was the entry that occurred after KR's prom pictures, but he nevertheless maintains that the scratch did not occur during that home invasion. Because first-degree home invasion can be supported by alternate theories arising during a single entry without permission, see *Baker*, 288 Mich App at 384-386, the trial court did not plainly err when it determined that the scrape occurred during the commission of the relevant home invasion. *Kimble*, 470 Mich at 312.

Rickert also maintains that the trial court cannot score 25 points under OV 1 for an accidental scraping. The Legislature provided that 25 points must be scored if a victim "was cut or stabbed with a knife or other cutting or stabbing weapon." MCL 777.31(1)(a). The Legislature did not provide that the victim had to have been intentionally cut or stabbed before 25 points could be scored. Accordingly, it was not plain error for the trial court to score 25 points under OV 1, even if Rickert accidentally scraped Mayett during the incident in the bedroom.

Even if the trial court erred when it scored 25 points under OV 1, Rickert has not demonstrated that the error warrants relief. Rickert assumes that OV 1 should have been scored at zero, but the Legislature provided that the trial court must assign the highest applicable score to OV 1. MCL 777.31(1). The trial court properly scores 15 points under OV 1 if a victim "had a reasonable apprehension of an immediate battery when threatened with a knife or other cutting or stabbing weapon." MCL 777.31(1)(c). And, the evidence plainly established that Mayett had a reasonable apprehension of an immediate battery when Rickert pushed her against the wall and threatened her with the meat fork immediately after he entered her dwelling. Thus, even if the

home invasion were complete at that point, the trial court would have been obliged to score 15 points under MCL 777.31(1)(c). Defense counsel conceded as much at sentencing. Thus, even if this Court were to conclude that the trial court plainly erred, that error would not alter the recommended sentencing range. See MCL 777.63. Therefore, the error would not warrant resentencing. *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

Rickert also briefly states that the trial court erred by scoring 25 points under OV 1 for the aggravated stalking and witness intimidation convictions. By failing to offer any meaningful analysis of this claim, he has abandoned it on appeal. See *People v Lopez*, 305 Mich App 686, 695; 854 NW2d 205 (2014).

Affirmed.


/s/ David H. Sawyer
/s/ Stephen L. Borrello
/s/ Deborah A. Servitto

-11-