# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
June 19, 2018

Plaintiff-Appellee,

v

No. 337645
Berrien Circuit Court

TIMOTHY LEE GRAY,

LC No. 2016-015358-FH

Defendant-Appellant.

Before: MURRAY, C.J., and HOEKSTRA and GADOLA, JJ.

PER CURIAM.

Defendant appeals as of right his jury conviction of embezzling $50,000 or more, but less than $100,000, MCL 750.174(6), from Southwestern Michigan Community Ambulance Service (Southwestern) while serving as its executive director. The trial court sentenced defendant to 180 days in jail and 5 years' probation. We affirm.

## I. FACTS

Southwestern is an ambulance service that provides emergency response services to eight municipalities in Southwest Michigan; six of the municipalities own the service while two municipalities contract for service. Defendant began his employment with Southwestern in 1984 as an emergency medical technician. He was thereafter employed in various capacities at Southwestern and was promoted to the position of executive director in 2008. Although Southwestern is governed by a board of trustees, the executive director is responsible for overseeing all aspects of Southwestern, both operational and financial, while making monthly financial reports to the board of trustees.

In June 2014, defendant resigned from Southwestern and James Scribner was appointed as the new executive director. After assuming the position, Scribner began to evaluate Southwestern's finances and discovered what appeared to be unjustified payments to defendant from Southwestern over the preceding several years. Scribner reported his findings to the board of trustees, which authorized an audit. The audit was performed by David Marshall, a certified public accountant and certified fraud examiner. Marshall concluded that from 2009 to 2014 defendant had been improperly compensated in five areas, being excessive paid time off compensation, unwarranted holiday pay, unwarranted dental reimbursement, unwarranted vision reimbursement, and unwarranted salary during a period of absence. Marshall's findings were turned over to the Michigan State Police, and the prosecutor thereafter charged defendant with

-1-

embezzlement. After a ten day jury trial, the jury found defendant guilty of embezzlement in violation of MCL 750.174(6). The trial court thereafter denied defendant's motion for new trial in which defendant argued that the verdict was against the great weight of the evidence.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

On appeal, defendant first contends that the evidence was insufficient to support the jury's verdict. We disagree. This Court reviews a challenge to the sufficiency of the evidence de novo, *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015), and examines the evidence in the light most favorable to the prosecution to determine whether "a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009). In so doing, we resolve all conflicts in the evidence in favor of the prosecution. *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005). Further, we do not interfere with the trier of fact's determinations regarding the credibility of the witnesses or the weight to be given the evidence. *People v Stevens*, 306 Mich App 620, 628; 858 NW2d 98 (2014).

In this case, defendant was charged with embezzlement in violation of MCL 750.174, which provides, in relevant part:

> (1) A person who as the agent, servant, or employee of another person, governmental entity within this state, or other legal entity or who as the trustee, bailee, or custodian of the property of another person, governmental entity within this state, or other legal entity fraudulently disposes of or converts to his or her own use, or takes or secretes with the intent to convert to his or her own use without the consent of his or her principal, any money or other personal property of his or her principal that has come to the person's possession or that is under his or her charge or control by virtue of his or her being an agent, servant, employee, trustee, bailee, or custodian, is guilty of embezzlement.

> * * *

> (6) If the money or personal property embezzled has a value of $50,000.00 or more but less than $100,000.00, the person is guilty of a felony punishable by imprisonment for not more than 15 years or a fine of not more than $25,000.00 or 3 times the value of the money or property embezzled, whichever is greater, or both imprisonment and a fine.

This Court has articulated the elements of embezzlement as follows:

> (1) the money in question must belong to the principal, (2) the defendant must have a relationship of trust with the principal as an agent or employee, (3) the money must come into the defendant's possession because of the relationship of trust, (4) the defendant dishonestly disposed of or converted the money to his own use or secreted the money, (5) the act must be without the consent of the principal, and (6) at the time of conversion, the defendant intended to defraud or

-2-

cheat the principal. [*People v Lueth*, 253 Mich App 670, 683; 660 NW2d 322 (2003).]

Thus, to establish the elements of this offense in this case the prosecution was required to prove that the money at issue belonged to Southwestern, that defendant had a relationship of trust with Southwestern as an agent or employee, that the money came into defendant's possession because of the relationship of trust, that defendant dishonestly disposed of or converted the money to his own use, that he did so without the consent of Southwestern, that he intended to defraud or cheat Southwestern, and that the amount wrongfully taken was at least $50,000. MCL 750.174(6). At trial, it was undisputed that Southwestern owned the money in question, that it employed defendant as its executive director during the period at issue, that his position was one of trust, and that defendant used his position of trust to cause Southwestern to disburse the money to him. The only issues at trial were whether defendant dishonestly converted the money to his own use and in what amount, whether Southwestern consented to the disbursements, and whether at the time of the conversion defendant intended to defraud or cheat Southwestern.

With regard to excessive paid time off compensation, the prosecution presented evidence that Southwestern had a vacation time and sick time sell-back policy that allowed an employee to sell unused accrued vacation and sick time back to Southwestern at the employee's hourly pay rate. The sell-backs were to be processed through the payroll system with the appropriate deductions. Defendant, as the executive director, was responsible for administering Southwestern's employee vacation time and sick time sell-backs, and was so familiar with the process that he trained his administrative assistants on the proper method for processing vacation and sick time sell-backs through the payroll system.

The prosecution presented evidence that defendant used the vacation and sick time sell-back procedure to pay himself compensation far beyond the vacation and sick hours that he actually accrued. In May 2009, defendant entered into an agreement with the board of trustees for Southwestern that settled an earlier dispute about the amount of vacation and sick time that he previously had accrued. In accordance with that agreement, Southwestern agreed to pay defendant for 1620.75 vacation and sick hours previously and currently accrued. Thereafter, defendant accrued 350 additional hours for the contract term beginning April 2010 and 450 hours for each additional contract term, beginning April 2011, April 2012, April 2013, and April 2014. Accordingly, the evidence established that defendant had 3770.75 total hours of vacation and sick time (including that from the May 2009 agreement) from May 2009 through his resignation in June 2014.

But according to the testimony and documentary evidence, defendant caused Southwestern to pay him for vacation and sick time far exceeding the 3770.75 accrued. During that time period, defendant caused Southwestern to pay him, either through direct deposit or payroll check, for 1520.75 hours in 2009-2010, for 745 hours in 2010-2011, for 401.22 hours in 2011-2012, for 1140 hours in 2012-2013, for 350 hours in 2013-2014, and for 400 hours in the final weeks of his employment in 2014. In addition, the prosecution showed that defendant caused Southwestern to issue two checks to him outside of the payroll system for vacation sell-backs that equaled approximately another 250 hours of vacation time. In total, defendant caused Southwestern to pay him for more than 4800 hours of vacation and sick time during a period when he accrued only 3770.75 hours. In other words, the prosecution introduced testimony and

documentary evidence that defendant used his position as the executive director to cause Southwestern to pay him for more than 1000 hours of vacation and sick time that he had not accrued in the amount of approximately $28,000.

When considering the sufficiency of the evidence, we consider the inferences that can be fairly drawn from the evidence. *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). Further, it is for the fact-finder alone to "determine what inferences may be fairly drawn from the evidence and determine the weight to be accorded those inferences." *Id.* Additionally, "because it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).

The scope of the excess compensation involved here—more than 1000 hours of additional vacation and sick time over a span of five contract years—strongly suggests that the additional sell-backs were not accidental. Further, the evidence demonstrated that defendant caused some of the sell-backs to occur through direct deposit during regular pay periods, but caused Southwestern to issue payroll checks on other occasions, and also caused Southwestern to issue him two checks outside the payroll system. Because the checks only needed the signatures of two board members, there was no evidence that the board as a whole was aware of the total amount of additional compensation from the sell-backs. From this evidence, a reasonable jury could infer that defendant knew that he was not entitled to the compensation, that he structured the payments in a manner that would avoid detection, and that he did so because he intended to defraud Southwestern of the money. See *id.*; see also *People v Hawkins*, 245 Mich App 439, 458; 628 NW2d 105 (2001) ("A factfinder can infer a defendant's intent from his words or from the act, means, or the manner employed to commit the offense.").

In addition to presenting evidence that defendant caused Southwestern to pay him for more vacation and sick time than he accrued by using the sell-back procedure, the prosecution also presented evidence that defendant took his regular salary during periods when he was actually absent due to vacation or illness. That is, defendant sold back his vacation and sick time, then nonetheless took vacation and sick days while receiving his regular compensation. The prosecution presented evidence in the form of e-mails in which defendant informed others that he was on vacation or out sick during certain periods, but did not take vacation or sick time for those periods. The evidence permitted an inference that defendant used or should have used more than 600 hours of his vacation or sick pay to cover his absences rather than selling the vacation and sick time back to Southwestern. Using defendant's lowest hourly rate, and excluding the additional benefits paid by Southwestern for the hours that should not have been available for sale, the additional hours conservatively represented more than $16,000 in unearned compensation. Marshall, the forensic examiner, testified that, using defendant's hourly rate for the relevant time period and including social security and other benefits, the actual value of the unearned sell-backs and undeclared vacation and sick days equaled $44,000 ($28,000 plus $16,000), but amounted to $58,000 in actual value. Consequently, the prosecution presented sufficient evidence to establish that defendant embezzled at least $50,000 from Southwestern through his misuse of the vacation and sick time sell-back policy.

On appeal, defendant argues that Marshall's testimony about the vacation and sick time sell-backs did not establish the elements of embezzlement because Marshall's assumptions were flawed. Specifically, defendant maintains that the May 2009 agreement setting his starting vacation and sick pay did not include the 300 hours that were provided in his employment agreement covering his employment from May 2009 to May 2010, and that Marshall thus understated defendant's vacation and sick time by 300 hours.

The May 2009 agreement setting the total vacation and sick time that defendant had accrued was dated May 18, which was several days after defendant and the board executed his first employment agreement as director. There was evidence that the purpose of the agreement was to settle defendant's claim that the previous director had improperly docked his hours and provided an initial total and a final total. The final total was 300 hours higher than the first total, which appeared to correspond to the amount of hours that the parties agreed defendant would accrue under his new contract. Although defendant maintained that the 300 hours represented the hours that he accrued during his first year as director, which was not governed by an employment agreement, the language and timing of the agreement suggests that it represented the totals available to defendant as of the signing of his new employment agreement. In reviewing the sufficiency of the evidence, this Court must view the evidence in the light most favorable to the prosecution. See *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). Because a reasonable jury could find that the total stated in the May 2009 agreement represented the total number of hours available to defendant at the start of his employment for the 2009 to 2010 employment period, it could find that Marshall did not understate the hours available to defendant.[1]

Defendant also maintains that Marshall erred by subtracting vacation and sick hours for time that he was away from the office because the evidence showed that he was a workaholic and actually worked more than the average of 50 hours per week required under the majority of his employment agreements. In other words, defendant's theory is that he usually worked more than the 50 hours per week he was contractually obligated to work and was therefore entitled to work less in other weeks without taking vacation time. A reasonable jury, however, could find that the agreements provided for an average of 50 hours each week with the understanding that defendant would nevertheless work every ordinary business day and was required to use vacation or sick time to cover those times when he did not report to work. The jury could find that defendant was periodically absent from work as demonstrated by the relevant e-mails and from that conclude that he deliberately chose to draw his full salary on days when the contractual expectation was that he must use vacation or sick time when absent.

Defendant's argument that there was insufficient evidence to support his conviction because he demonstrated that his vacation and sick pay sell-backs were approved is similarly

---

[1] Notably, even if one were to add 300 hours to defendant's starting accrued vacation and sick hours and were to assume that he had no obligation to use any sick or vacation time other than what he actually reported, defendant still caused Southwestern Ambulance to pay him for hundreds more hours of vacation and sick time than he had available during the period at issue.

misplaced. Two members of the board, William Weimer, Sr., and William Marx, testified at trial that they both signed checks to defendant that were identified as being for vacation or sick time sell-backs. However, there was no evidence that either board member had been informed that the checks represented compensation for hours beyond those that defendant had accrued. Marx stated that he assumed that the check had already been "vetted" by the chairman and that it was appropriate to approve it. Weimer, who was the chairman throughout much of the time at issue, testified that he took defendant's word that he was entitled to the vacation time sell-backs when authorizing the payments. When viewed in the light most favorable to the prosecution, a reasonable jury could infer that the individual board members or the board as a whole were not actually or impliedly authorizing defendant to sell more vacation or sick time than he was entitled to have under the employment agreements.

The prosecution also presented evidence that defendant wrongfully obtained compensation from Southwestern in the form of holiday pay and dental and vision reimbursements. The evidence showed that defendant took compensation—characterized as holiday or other pay—that had not been authorized by the board and that was inconsistent with the treatment of holiday pay for a salaried worker. There was also evidence that defendant took vision reimbursements and dental reimbursements in excess of the limits. Marshall conceded that after his review of the evidence, he discovered information that required him to adjust his determinations about defendant's holiday compensation and vision reimbursements. Nevertheless, defendant's evidence tending to suggest that he misappropriated less than Marshall stated or did not misappropriate holiday pay or vision or dental reimbursements at all, was a matter of the weight and credibility of the evidence, not its sufficiency. See *Wolfe*, 440 Mich at 514-515.

We also reject defendant's contention that the prosecution's proofs were insufficient because the prosecution introduced into evidence unsigned board minutes as opposed to signed board minutes. Defendant maintained at trial that the minutes were not official because they were unsigned and the signed minutes sometimes had alterations that the board made after he submitted the proposed minutes at the next board meeting that would vindicate him by showing approval of additional compensation. But to accept defendant's view of the evidence, the jury would have to find that defendant always inadvertently left out of the draft minutes the board's approval of his extra compensation only to have it later added to the signed minutes. Further, Marx testified that he did not recall the board approving the holiday bonuses paid to defendant in 2010, 2011, 2012, or 2013, and would be surprised to hear that these bonuses were added to payroll. A reasonable jury therefore could conclude that the minutes prepared by defendant and submitted by defendant for approval would have included important details such as the approval of extra compensation for the director. The unsigned minutes, when viewed in the light most favorable to the prosecution and considering the evidence as a whole, were evidence that the board had not approved any extra compensation for defendant beyond that identified in his employment agreements.

The prosecution also presented evidence that defendant received unwarranted compensation during an absence when he also received disability compensation. In the months leading up to his resignation in June 2014, defendant underwent two elbow surgeries and therefore did not work. The testimony of administrative assistant Laurie Percy established that during these months defendant rarely was in the office and only came to the office briefly to pick

up messages. During this time, defendant continued to receive his full salary, collecting $25,279.09 in salary during that period, which had a total value of $29,740.85, but also applied for and received disability compensation. Defendant represented to the insurer that he was not working and did not have any sick time available, and told Percy to inform the insurer that he did not have any sick time available to cover the period of his disability. Although there was conflicting testimony regarding whether defendant could receive disability benefits while still receiving his full salary, Marx, a member of the board of trustees, testified that he was surprised to learn that defendant was being paid his full salary during those months. A reasonable jury could find from this evidence that defendant did not earn his salary during this time, knew that he was not entitled to his salary, and deliberately, dishonestly, and with the intent to defraud, continued to collect it.

Defense counsel fully explored the assumptions and limits of Marshall's audit in his cross-examination at trial. To the extent that Marshall's testimony relied on assumptions about the applicable agreements and policies, any suggested flaws were a matter of the weight and credibility to be afforded his testimony, which was for the jury alone to determine. See *People v Lemmon*, 456 Mich 625, 646-647; 576 NW2d 129 (1998) (when the question is one of credibility posed by diametrically opposed versions of the events in question, courts must leave the test of credibility with the trier of fact). The prosecution thus presented sufficient evidence to establish that defendant dishonestly converted more than $50,000 of Southwestern's money to his own use, without the consent of Southwestern, and with the intent to defraud Southwestern.

### B. GREAT WEIGHT OF THE EVIDENCE

Defendant next contends that, even if the evidence is minimally sufficient to support the jury's verdict, the flaws in the evidence show that the jury's verdict was contrary to the great weight of the evidence. We disagree. Before the trial court, defendant moved for a new trial[2] on the basis that the verdict was against the great weight of the evidence, and the trial court denied defendant's motion. We review a trial court's decision on a motion for new trial brought on the basis that the verdict was against the great weight of the evidence for an abuse of discretion, *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). An abuse of discretion occurs when a trial court chooses an outcome outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

A verdict is against the great weight of the evidence when "the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to permit the verdict to stand." *Lacalamita*, 286 Mich App at 469. Conflicting testimony is an insufficient ground for granting a new trial, *People v Lemmon*, 456 Mich 625, 647; 576 NW2d 129 (1998), and

---

[2] MCL 770.1 provides that "[t]he judge of a court in which the trial of an offense is held may grant a new trial to the defendant, for any cause for which by law a new trial may be granted, or when it appears to the court that justice has not been done, and on the terms or conditions as the court directs." MCR 6.431(B) provides, in relevant part, that "[o]n the defendant's motion, the court may order a new trial on any ground that would support appellate reversal of the conviction or because it believes that the verdict has resulted in a miscarriage of justice."

generally the resolution of issues of credibility are exclusively the province of the jury. *People v DeLisle*, 202 Mich App 658, 662; 509 NW2d 885 (1993). As this Court has stated, when considering a challenge to the great weight of the evidence, we do not "sit as the 13th juror and reassess the evidence." *People v Bosca*, 310 Mich App 1, 13; 871 NW2d 307 (2015) (quotation marks and citation omitted). In sum, the existence of flaws in the evidence does not permit a trial court to set aside that evidence, and conflicts in the evidence or questions as to the credibility of witnesses are not sufficient grounds to grant a new trial unless the testimony or evidence contradicts undisputable physical facts or laws or is so patently incredible or inherently implausible that no reasonable juror could believe it. *Lemmon*, 456 Mich 643-644.

In this case, the trial court, citing the above standard, denied defendant's motion for new trial, concluding that the jury verdict was not against the great weight of the evidence. In its order denying the motion, the trial court observed:

> [T]he Court notes that while Defendant's brief is heavily focused on the testimony of Mr. Marshall that testimony accounted only for a part of the People's case. The jury in this case listened to twelve other witnesses over a ten day period, one of which was the Defendant himself.
>
> Defendant asserts poor accounting and record keeping practices are to be blamed for any financial mistakes or misunderstandings rather than an intent on his part to defraud or cheat [Southwestern]. Much is conveyed through first hand observation of a witness that may not be gained by reading the written word. Direct observation of a witness's demeanor as well as speech inflections go a long way in juror determination of the credibility of a witness. The authenticity of a witness's testimony may be deduced upon consideration of the totality of that person's courtroom presentation.
>
> Defendant's credibility could reasonably be perceived as strained during the course of this trial at several junctures, including his claim of working 60-70 hours within a four day period averaging 13.75 hour work days immediately upon his return from a two and a half week long vacation in Italy from July 28 through August 31, 2013, as explanation for claiming the use of only 100 hours (2 week average pay period) covering that time. Defendant further claimed only 50 hours of vacation time for an April 9 through 22, 2014 vacation (including 9 days where he was out of the country).
>
> Defendant's testimony regarding his "sell back" vacation/sick time to [Southwestern] could also give pause to a reasonable trier of fact. . . . Defendant indicated he disputed some of the 1,520.75 hours (over 30 weeks) calculated as "sell back" by Defendant to [Southwestern] totaling $42,398.51 income in addition to salary received by Defendant. The Union Labor Agreement Act (EX 3) indicates that vacation sell back was to be at the employee's regular hourly rate and included in the next regularly scheduled payroll with no separate checks being issued. . . . [Southwestern's] records show, however, Defendant received several individual checks for his vacation sell back. Between April 30, 2012 and October 15, 2012, Defendant sold back vacation time to [Southwestern] under

seven separate entries totaling $18,658.38. Exhibits 5 and 7 show each of these seven entries to be an individual check payable to Defendant. Calculating a 50 hour work week the sellback benefit to defendant was approximately $51.82 per hour at a time when Defendant's annual salary was $79,979 (approximately $30.76/hour for a 2600 hour work year). . . .

The Jury in this case was not merely reviewing a forensic accounting and passing judgment on the assessments made by Marshall. The Jury was assessing the testimony and credibility of many of the main players in this case, including Defendant himself. At the conclusion of a two week long trial, it took them only a little over two hours to agree on defendant's guilt. This Court finds the decision of the jury was not against the great weight of the evidence.

We agree with the conclusion and the reasoning of the trial court. Here, the prosecutor presented evidence that defendant engaged in a pattern of paying himself unauthorized compensation over a period of years and in a variety of ways. Although defendant presented evidence suggesting that the extent of the purported overpayments had been misstated and were in some instances the result of negligence rather than deliberate wrongful conduct, the jury could reasonably find from the evidence that defendant deliberately and dishonestly caused Southwestern to pay him unauthorized compensation in excess of $50,000 during the period at issue and that he did so with the intent to defraud Southwestern. Defendant points to alleged errors in Marshall's calculations, but the forensic accounting conducted by Marshall demonstrating numerous overpayments to defendant and the implausibility of defendant's explanations strongly suggested that defendant manipulated his position to obtain unauthorized compensation. To the extent that there were discrepancies in the evidence presented, the evidence was such that different minds might naturally come to different conclusions and therefore did not warrant the trial court disturbing the jury's resolution of the factual dispute. See *Lemmon*, 456 Mich at 644.

We therefore conclude that the trial court did not abuse its discretion in denying defendant's motion for new trial premised on the contention that the verdict was against the great weight of the evidence. See *Roper*, 286 Mich App at 84.

Affirmed.

/s/ Christopher M. Murray
/s/ Joel P. Hoekstra
/s/ Michael F. Gadola