*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

GREGORY ALLEN BELKIN,

        Defendant-Appellant.

UNPUBLISHED
February 28, 2019

No. 341915
Oakland Circuit Court
LC No. 2017-262898-FC

Before: TUKEL, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

Defendant pleaded nolo contendere to second-degree murder, MCL 750.317, and operating a motor vehicle while intoxicated (OWI) causing death, MCL 257.625(4). He was sentenced to 25 to 40 years' imprisonment for the second-degree murder conviction and to 10 to 15 years for the OWI conviction. Defendant now appeals by leave granted. *People v Belkin*, unpublished order of the Court of Appeals, entered March 16, 2018 (Docket No. 341915). We affirm.

On January 24, 2017, defendant was driving his Maserati eastbound on Square Lake Road in Bloomfield Township when he crashed into the rear end of Rhonda Williams's vehicle. Williams was pronounced dead at the hospital shortly after the crash. Later testing revealed that defendant had a blood-alcohol content of 0.315 and that he was traveling 145 mph a half-second before the moment of impact and at 134 mph at the moment of impact. Seconds before the crash, defendant was speaking on the telephone stating, "I'm going 100, I'm going 120, I'm going 150.

On appeal, defendant argues that the trial court erred by assessing 10 points for offense variable (OV) 1 (aggravated use of a weapon), one point for OV 2 (lethal potential of a weapon used or possessed), and 25 points for OV 6 (intent to kill or injure an individual). When reviewing a trial court's scoring decision, the trial court's "factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake

has been made." *People v Antwine*, 293 Mich App 192, 194; 809 NW2d 439 (2011) (quotation marks and citation omitted). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Hardy*, 494 Mich at 438.

## I. OV 1 AND OV 2

Defendant first argues that the trial court erred by assessing 10 points for OV 1 and one point for OV 2. We agree.

"OV 1 assesses points for the aggravated use of a weapon, MCL 777.31 . . . ." *People v Morson*, 471 Mich 248, 256; 685 NW2d 203 (2004). Ten points is properly scored for OV 1 if "[t]he victim was touched by any other type of weapon." MCL 777.31(1)(d).

"Points are assessed for OV 2 when an offender possessed or used a weapon during the commission of a crime, and the amount of points assessed depends on the lethal potential of the weapon." *People v Jackson*, 320 Mich App 514, 524; 907 NW2d 865 (2017). MCL 777.32 lists the various number of points which should be scored depending on the type of weapon used. While it specifies the number of points that are to be scored for certain weapons, such as "harmful biological substance," "fully automatic weapon," "pistol," and "knife," the guideline does not list a car or automobile. However, under MCL 777.32(1)(e), one point is properly scored for OV 2 if "[t]he offender possessed or used any other potentially lethal weapon" not enumerated in the statute.

Therefore, each of OV 1 and OV 2 requires the use of a "weapon" in order for a trial court to assess points. Relying on both dictionary definitions and the plain, common, everyday meaning of the words, this Court has held that within the context of OV 1, a "weapon" is "any other instrument or device used for attack [or defense] in a fight or in combat." *People v Lange*, 251 Mich App 247, 257; 650 NW2d 691 (2002) (ellipses and original brackets omitted).

Thus, the manner in which an item is used determines whether it is a weapon for sentencing guidelines scoring purposes.[1] Furthermore, this Court has extended this definition of weapon to OV 2, holding that when an object does not qualify as a weapon under OV 1 it cannot qualify as a weapon under OV 2. *People v Hutcheson*, 308 Mich App 10, 17; 865 NW2d 44 (2014).

The prosecution contends that a vehicle can constitute a weapon when it is employed in a manner capable of inflicting serious injury or death. The prosecution argues that defendant's vehicle qualifies as a weapon because defendant drove it in excess of 130 miles per hour while intoxicated and on a public roadway. The prosecution's argument, however, misstates the law, which requires that in order to qualify as a weapon, the item must be used against a victim for

---

[1] It is clear that in *Lange* the defendant intended to use the item, a glass mug, as a weapon, as he repeatedly struck his wife in the head with the mug after learning that she was involved in an extra-marital affair. *Lange*, 251 Mich App at 248.

attack or defense in a fight or in combat. Furthermore, the cases the prosecution relies on involve instances in which the vehicle in question *was used for attack*. See *People v Goolsby*, 284 Mich 375, 377; 279 NW 867 (1938) (following an altercation with a police officer, the defendant drove his vehicle directly at the police officer and injured him); *People v Blacksmith*, 66 Mich App 216, 217-219; 238 NW2d 810 (1975) (the defendant used his vehicle to ram police cars during a car chase). Thus, while the prosecution is correct that Michigan courts have in the past found vehicles to be weapons because they were employed in a manner capable of inflicting serious injury or death, these instances involve vehicles being used to attack or assault other individuals. The cases cited by the prosecution, therefore, do not demonstrate an exception to the general rule determining when an object is a weapon.

Defendant's action of driving his vehicle in excess of 130 miles per hour while highly intoxicated and on a public roadway undeniably created a high risk of serious injury or death, and did in fact cause Williams's death. Defendant, however, did not use his vehicle for attack or defense in a fight or in combat. Defendant did not specifically target Williams or anyone else when he was driving the night of the crash, and the record does not contain any facts indicating that defendant used his vehicle to attack or defend himself in a fight or combat. Therefore, the trial court clearly erred when it determined that defendant's car was a weapon for purposes of OV 1 and OV 2. Therefore, these OVs should have been scored at zero points each.

## II. OV 6

Defendant also argues that the trial court erred by assessing 25 points for OV 6. We disagree.

OV 6 considers "the offender's intent to kill or injure another individual." MCL 777.36(1). In order to assess 25 points for OV 6, a trial court must find that "[t]he offender had unpremeditated intent to kill, the intent to do great bodily harm, or created a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result." MCL 777.36(1)(b). At issue in this case is the last aspect, whether defendant "created a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result."

A nolo contendere plea establishes "a defendant's desire not to contest the issue of his factual guilt. It is an admission of all the essential elements of the charged offense and is tantamount to an admission of guilt for purposes of the case." *People v New*, 427 Mich 482, 493 n 10; 398 NW2d 358 (1986) (citations omitted). A conviction for second-degree murder requires the prosecution to prove "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Roper*, 286 Mich App 77, 84; 777 NW2d 483 (2009) (quotation marks and citation omitted). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or *the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm.*" *Id*. (emphasis added; quotation marks and citation omitted). Defendant had no intent to kill or cause great bodily harm; therefore, under the circumstances present here, defendant's plea of nolo contendere establishes that he had the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of that behavior was to cause death or great bodily harm. This element is synonymous with the requirement under OV 6—namely, that defendant "created

a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result." Therefore, the trial court did not err in scoring OV 6 at 25 points.

Defendant claims that the underlying malice element of second-degree murder cannot support a score of 25 points under OV 6 because second-degree murder requires that death or great bodily harm be a "likely" result from the conduct, as opposed to the OV 6 requirement that death or great bodily harm be "the probable result" of the conduct. However, this is merely a distinction without a difference. This Court in *People v Nix*, 301 Mich App 195, 200-201; 836 NW2d 224 (2013), interpreted "probably" as being a synonym of "likely." Thus, whether defendant's conduct was *likely* to cause death or great bodily harm or whether it was *probable* that the conduct would cause death or great bodily harm has no significance. Therefore, defendant's conviction of second-degree murder supports the scoring of 25 points for OV 6.

Moreover, even if defendant's plea of nolo contendere was not sufficient by itself to support the scoring of OV 6, the underlying facts as presented to the trial court are. Defendant avers that he did not create a risk knowing that death or great bodily harm was the likely result because he was not "presently conscious and thoughtful of the risk he was creating" at the time of the crash. We find defendant's argument unpersuasive because he was aware enough to get in his car, drive, and call his ex-girlfriend to brag about his speed just moments before the crash. Because defendant had the presence of mind to drive his vehicle and call his ex-girlfriend, while discussing his alarming rate of speed, we hold that he created a risk while knowing that death or great bodily harm was the probable or likely result.

Defendant's reliance on statistics from Mothers Against Drunk Driving (MADD), which he asserts demonstrate that the risk he created while driving drunk did not create a likelihood of causing death or great bodily harm, is misplaced. The data from MADD shows that on a daily basis, there are 300,000 incidents of drunk driving leading to 28 deaths. Defendant argues that this correlates to a 0.009% chance that an incident of drunk driving will lead to death and, therefore, that death or great bodily harm was not the "probable" outcome of his actions.

It is no criticism at all of MADD's laudable mission to say that its citation of the drunk-driving death rate is not designed as a predictive model of the profile of any particular driver, and whether or not that particular driver is likely to cause death by driving drunk. Rather, MADD's use of that particular statistic is part of its mission of public education, to define the scope of the problem, in support of its public policy proposals.[2] A purported predictive model, as defendant seeks to use the statistics, would lie in the realm of the social sciences and the proper application of statistical models which would control for the different variables at play in drunk driving offenses, which include blood-alcohol level; the degree to which a defendant's blood-alcohol level exceeds the legal limit; the differing blood-alcohol levels which states have criminalized; accidents involving alcohol only, drugs only, or a combination of the two; and the manner in which a defendant drives. See generally *Bazemore v Friday*, 478 US 385, 400; 106 S Ct 3000; 92 L Ed 2d 315 (1986) (discussing the use of regression analysis generally to control for variables regarding a particular party's actions). Defendant's use of statistics gathered by

---

[2] See <https://www.madd.org/the-solution> (last visited January 28, 2019).

MADD merely lumps all drunk driving offenses together and then purports to draw some meaningful analysis at the granular level as to the likelihood of a particular result in a particular case, a clearly invalid use of MADD's data.[3] Defendant made no attempt to demonstrate the reliability of the data for the purposes for which it was offered.

By choosing data defining the *scope* of the national problem, defendant also ignores other MADD statistics which might support a different conclusion. For example, MADD notes that "every 51 minutes, someone is killed" as a result of drunk driving, and "drunk driving is still the number 1 cause of death on our roadways." MADD also notes that every two minutes, someone is injured in a drunk driving crash.[4] The MADD data, applied to defendant's conduct, which so egregiously deviates from a typical drunk driving offense, may well support a finding that it was quite likely, even overwhelmingly likely, that death would result. Defendant's blood-alcohol level was 0.315 (or nearly four times the legal limit); he was not merely speeding—he was driving a high-powered sports car in excess of 140 miles per hour; and he was on the phone immediately before the accident bragging about his speed. The victim's car was moving in the same direction as defendant's own at 53 miles per hour; the force of the impact which defendant precipitated was the equivalent of hitting a stationary individual at more than 80 miles per hour. And defendant engaged in such a conduct on a surface street, not a highway, which is designed to handle higher speeds more safely, although certainly not to anything approaching the level engaged in by defendant. In light of the MADD statistic that more than one person an hour is killed by a drunk driver, and the facts of defendant's actions the night of the incident, we think it highly likely that in that one-hour period, no other drunk driver in America demonstrated conduct more likely to cause an accident; and that if a collision were to occur, striking the victim at the equivalent of a car moving at 80 miles per hour striking a person at a standstill, the result would have been the certainty of the victim's death. So while we reject defendant's use of the MADD statistics, and do not rely on any of the MADD data ourselves, we do note that based on defendant's generalized citation to it, and assuming the reliability of it, the data might well support the opposite conclusion from that for which defendant argues.

Rather, for our purposes, based on defendant's particular, individualized conduct, suffice it to say that we are not left with a definite and firm conviction that a mistake was made by the trial court when it found that defendant "created a very high risk of death or great bodily harm

---

[3] The rules of evidence do not apply at sentencing. MRE 1101(b)(3). Thus, defendant was not required to satisfy the *Daubert* standard, as adopted in Michigan to bring the MADD data before the trial court. See *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993); *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 781; 685 NW2d 391 (2004) (noting that MRE 702 incorporates *Daubert*'s standards of reliability) However, sentencing decisions must themselves be supported by "reliable evidence." *People v Lawrence*, 206 Mich App 378, 379; 522 NW2d 654 (1994). Many of the same principles applicable to a *Daubert* analysis also apply to determining reliability of information for use at sentencing. Thus, in order to make a reliable statistical analysis of the likelihood of any particular accident causing death requires a properly drawn regression analysis accounting for the variables involved.

[4] See <https://www.madd.org/the-problem> (last visited January 28, 2019).

knowing that death or great bodily harm was the probable result." As noted by the trial judge, "in all the years that I've served on this bench, I have not seen a drunk driving case that caused death that was this egregious." Therefore, the trial court did not err when it assessed 25 points for OV 6.

### III. IMPACT OF OV 1 AND OV 2 ERRORS

Because OV 1 and OV 2 were erroneously scored at 10 points and one point respectively, defendant's total OV score should be reduced from 126 points to 115 points. This change in total OV score, however, does not alter defendant's minimum sentencing guidelines range because the OV level is still III, which is the level which the trial court found at sentencing. See MCL 777.61. This OV level, coupled with defendant's prior record variable level, yields a minimum sentencing guidelines range of 225 to 375 months or life. *Id*. "Where a scoring error does not alter the appropriate guidelines range, resentencing is not required." *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006). Therefore, although the trial court erroneously scored OV 1 and OV2, defendant is not entitled to resentencing.

Affirmed.

/s/ Jonathan Tukel
/s/ Michael F. Gadola